OPINION
{¶ 1} Defendant-appellant, Rachel Parks, appeals the judgment of the Van Wert County Court of Common Pleas, finding her guilty of Endangering Children, in violation of R.C. 2919.22(B)(1), a second degree felony, and sentencing her to a term of four years in prison.
 {¶ 2} This case arises from injuries sustained by the victim, Katrina Runyon (hereinafter "Katrina"). Katrina is the daughter of appellant and Adam Runyon (hereinafter "Adam"). In February 2002, at the time of Katrina's injuries, Adam was working full time and living with his parents, Douglas and Joyce, who helped care for Katrina. Also during this time, appellant was attending high school and living with her boyfriend, Matt Tucker. Pursuant to a shared parenting agreement, appellant had custody of Katrina on Mondays, Wednesdays and every other weekend. Adam had custody of Katrina on Tuesdays, Thursdays and every other weekend. During the weekdays, while Adam was at work and appellant was in school, Katrina was in the care of a babysitter.
 {¶ 3} The events leading to Katrina's injuries began February 22, 2002. Pursuant to the shared parenting agreement, Katrina was in appellant's care from Friday, February 22 until Adam picked her up on the evening of Sunday, February 24. When Adam arrived home with Katrina, his mother, Joyce, noticed that Katrina was acting unusually, that she would not eat dinner and seemed very listless. On Monday morning, Katrina's condition worsened and she began vomiting. In response, Joyce took Katrina to the Van Wert County Hospital where a CT scan and head x-ray were performed. Although the tests were subsequently found to indicate a subdural hematoma,[1] the doctor, at the time, diagnosed Katrina as suffering from a virus. Joyce was told to monitor Katrina and to call if she did not improve the next day. The appellant picked Katrina up on Monday afternoon and Katrina stayed with appellant Monday night.
 {¶ 4} On Tuesday morning, appellant took Katrina to the babysitter. Seeing that Katrina was still very listless and unresponsive, the babysitter contacted Joyce, who picked up Katrina and took her to the emergency room. At the emergency room, blood was drawn, a urine specimen was taken and a full examination was performed. Once again, the doctors found nothing unusual and diagnosed a virus. Katrina was returned to Adam and remained in his care Tuesday night.
 {¶ 5} From Tuesday night to Wednesday morning Katrina continued to vomit and to be very listless. Joyce once again contacted the doctor who reaffirmed that Katrina had a virus which would take some time to get over. Katrina went to the babysitter on Wednesday where she stayed until the afternoon when appellant picked her up.
 {¶ 6} On Wednesday night, Adam picked up Katrina from appellant's house. Katrina stayed with Adam that night. The following morning, Thursday, February 28, Joyce took Katrina to a doctor's appointment that had been scheduled on Monday.
 {¶ 7} Pursuant to the custody schedule, Adam had custody of Katrina on Thursday and the upcoming weekend. Accordingly, appellant had no contact with Katrina after Wednesday evening until Monday, March 4. Although appellant was supposed to pick up Katrina on Sunday evening, she called Adam to see if he could keep Katrina until Monday. Joyce and Adam testified that Katrina's condition showed marked improvement throughout the rest of the week while Katrina was in their care. Joyce testified that by Monday morning, Katrina was keeping food down and was much more active, but still showed signs of a cold. During the day on Monday, March 4, Katrina was in the care of Joyce and Douglas until Adam came home from work. Appellant picked Katrina up Monday afternoon.
 {¶ 8} On Tuesday, March 5, because Katrina was still showing signs of a cold and could not go to the babysitter, appellant had to stay home from school with her. Appellant testified that Tuesday morning Katrina seemed a little under the weather, but she ate breakfast and appellant put her down for a nap. At approximately 12:30 p.m., after Katrina's nap, appellant went to her boyfriend's place of work to get money to do the laundry. Appellant then took Katrina to the laundromat and returned home around 1:30. Appellant testified that she was preparing Katrina's lunch when it appeared that Katrina became unconscious.
 {¶ 9} Appellant took Katrina and went back to her boyfriend's place of work. After seeing Katrina, appellant's boyfriend decided Katrina needed to see a doctor. Appellant and her boyfriend then proceeded to take Katrina to the Van Wert County Hospital emergency room.
 {¶ 10} At the emergency room, Katrina was given a CT scan. After receiving the results of the test indicating a subdural hematoma, doctors determined that Katrina needed to be life-flighted to Fort Wayne, Indiana for surgery. After arriving in Fort Wayne, Katrina underwent an operation to relieve pressure and bleeding in her brain. She remained in the intensive care unit for the majority of the next five days and was finally discharged from the hospital on March 20, 2002.
 {¶ 11} Appellant was subsequently indicted on one count of Endangering Children, in violation of R.C. 2919.22(B)(1), a second degree felony. Following a jury trial, appellant was found guilty and was sentenced to a four-year prison term.
 {¶ 12} It is from this judgment that appellant appeals and sets forth four assignments of error for our review.
Assignment of Error No. I
 The verdict of the jury went against the manifest weight ofthe evidence presented at trial and should be reversed.
 {¶ 13} In determining whether a verdict is against the manifest weight of the evidence, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Martin (1983), 20 Ohio App.3d 172, 175. The weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." State v. Thompkins (1997),78 Ohio St.3d 380, 387. This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the factfinder lost its way.State v. Twitty, 2d Dist. No. 18749, 2002-Ohio-5595.
 {¶ 14} Appellant asserts that the verdict is against the manifest weight of the evidence because no credible evidence existed to support the state's theory that it was more likely that the injury to Katrina occurred while she was in the care of the appellant, rather than while she was in the care of Adam and his parents. Appellant specifically argues that two of the three expert witnesses testified that Katrina's injury could have occurred up to 72 hours before the symptoms would have manifested. The third expert, however, testified that the injury could only have occurred on March 5 when Katrina was in the sole custody of appellant. Appellant contends that this expert's opinion was less credible than the other experts because the third expert witness had little experience in evaluating the type of injuries sustained by Katrina.
 {¶ 15} Appellant further asserts that she participated in a polygraph exam which indicated that she was not being deceptive when she told the examiner that she had not injured Katrina. The appellant claims that the polygraph examination, coupled with the expert witness testimony, required a finding of not guilty to the charge of Endangering Children. The jury's verdict, appellant argues, is, therefore, against the manifest weight of the evidence.
 {¶ 16} The appellant was indicted for violation R.C.2919.22(B)(1). The statute states in pertinent part, "[n]o person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) abuse the child * * *." Therefore, to establish a violation of R.C. 2919.22(B)(1), the state must prove, beyond a reasonable doubt that (1) the child is under eighteen and (2) an affirmative act of abuse. State v.Burdine-Justice (1998), 125 Ohio App.3d 707, 713.
 {¶ 17} As Katrina was just over a year old when she sustained her injuries, the first element of R.C. 2919.22 (B)(1) is satisfied. To establish that appellant had endangered Katrina, the state was also required to show that appellant engaged in an affirmative act of abuse. Child abuse is defined as an act that "inflicts serious harm or creates a substantial risk of serious harm to the physical health or safety of the child." R.C.2151.031.
 {¶ 18} To prove that an act of abuse had occurred, the state introduced the testimony of Adam and Joyce, as well as two of appellant's friends who had seen Katrina on the morning of March 5. Joyce and Adam both testified that Katrina's condition had greatly improved by Monday, March 4, when appellant picked up Katrina. Appellant's two friends testified that on the morning of March 5, Katrina seemed to have a slight cold, but was otherwise acting normally.
 {¶ 19} The state also introduced the testimony of Dr. Michael Munz, an emergency room doctor at Parkview Hospital in Fort Wayne who consulted on Katrina's case. Dr. Munz testified that Katrina had sustained two head injuries. The first injury occurred prior to February 25, as the injury was present on Katrina's first CT scan at Van Wert County Hospital on February 25. The other injury, Dr. Munz opined, had most likely occurred on March 5, the day Katrina was flown to Parkview Hospital. In Dr. Munz's opinion, Katrina suffered Shaken Baby Syndrome.
 {¶ 20} Two other expert witnesses testified. These experts were Dr. William Louis and Dr. Mary Edwards-Brown. Both experts agreed that two injuries had occurred and that the first injury occurred around February 25. As to the second injury, Dr. Louis testified that there would have been no period of conscious, normal behavior between Katrina's injury and the presentation of symptoms. Therefore, Dr. Louis stated that Katrina's second injury occurred on March 5 and even offered an opinion that the injury probably occurred around 12:00 p.m. Dr. Louis concurred with Dr. Munz's diagnosis of Shaken Baby Syndrome.
 {¶ 21} Dr. Edwards-Brown, however, testified that Katrina's injury occurred 48 to 72 hours before her visit to the hospital on March 5. Dr. Edwards-Brown stated that the possibility existed that the injury could have occurred immediately before Katrina was taken to the hospital on March 5, but stated it was unlikely, as it would take some time for the amount of blood present in Katrina's brain to accumulate. Dr. Edwards-Brown also stated that Katrina's injuries were not typical of Shaken Baby Syndrome.
 {¶ 22} We find that there was credible evidence to support the jury's verdict. The record and witness testimony indicated the following: Katrina's condition was normal on the morning on March 5; appellant was Katrina's only caregiver on that day; two of the three expert witnesses testified that Katrina's second injury most likely occurred on March 5. Although the third expert stated it was unlikely the second injury occurred March 5, this court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the factfinder lost its way. State v. Twitty, 2d Dist. No. 18749, 2002-Ohio-5595. Based on the preceding, we do not find that the jury clearly lost its way by finding one expert opinion more credible and persuasive than another. Therefore, we hold the verdict of the jury was not against the manifest weight of the evidence.
 {¶ 23} Accordingly, appellant's first assignment of error is overruled.
Assignment of Error No. II
 The trial court erred to the prejudice of the Defendant byallowing a photograph to be presented to the jury and admittedinto evidence where the danger of unfair prejudice, confusion ofthe issues and misleading the jury substantially outweighed thephotograph's probative value.
 {¶ 24} In her second assignment of error, appellant asserts that the trial court erred in admitting a photograph of Katrina lying in her hospital bed in the intensive care unit at Parkview Hospital, apparently on life support. Since the photograph does not depict any of Katrina's injuries and there was no question that Katrina stayed in the hospital or was on life support, the appellant alleges that the photograph was not relevant. Moreover, appellant contends that the admission of the photograph inflamed the passion of the jurors and prejudiced the jury against the appellant. The appellant, therefore, asserts that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice and the trial court should not have admitted it.
 {¶ 25} It is well settled that the admission of photographs is left to the discretion of the trial court. State v. Smith,80 Ohio St.3d 89, 108, 1997-Ohio-355. A trial court may reject a photograph, otherwise admissible, due to its inflammatory nature if on balance the unfair prejudice to the defendant substantially outweighs its probative value. Evid.R. 403(A). However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible. State v. Woodards
(1966), 6 Ohio St.2d 14, 25. "The trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." State v. Hymore (1967), 9 Ohio St.2d 122, 128. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the trial court that is unreasonable, unconscionable, or arbitrary. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 26} The photograph that was admitted into evidence depicts Katrina in a hospital bed covered with a blanket with a bandage around her head and tubes connected to her mouth and nose. Although the photograph does not depict Katrina's injuries per se, the state argues, and we agree, it evidences that Katrina suffered serious physical harm as a result of her injuries, an element the state was required to prove. See R.C. 2151.031. Moreover, we do not find that the photograph was so horrendous to inflame the passion of the jury. Therefore, we do not find that the trial court abused its discretion in admitting this particular photograph.
Appellant's second assignment of error is overruled.
Assignment of error No. III
 The trial court erred to the prejudice of the Defendant whenit allowed the State's expert witness to testify concerningmatters outside his area of expertise.
 {¶ 27} A decision to admit the testimony of an expert is generally within the broad discretion of the trial court, and will not be disturbed absent a showing of an abuse of discretion.State v. Reiner (2000), 89 Ohio St.3d 342.
 {¶ 28} Ohio Evid. R. 702 provides that a witness qualifies as an expert witness if the witness meets three requirements:
(A) The witness' testimony either relates to matters beyondthe knowledge or experience possessed by lay persons or dispels amisconception common among lay persons;
 (B) The witness is qualified as an expert by specializedknowledge, skill, experience, training, or education regardingthe subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific,technical, or other specialized information. * * *
 {¶ 29} Appellant argues that the trial court erred when it allowed Dr. Louis, one of the expert witnesses, to testify about the "profile" of a child abuser. The appellant contends that Dr. Louis had no special training, experience or skill with child abuse profiling and Dr. Louis's testimony violated Evid.R. 702.
 {¶ 30} Dr. Louis, a physician certified in pediatrics and new-born medicine, testified at trial regarding his particular qualifications pertinent to preparing a profile on a child abuser. Dr. Louis stated that he has a continued interest in child abuse issues and that he is a member of the Section of American Pediatrics on Child Abuse and Neglect, has served on Indiana child abuse panels for the American Academy of Pediatrics, has lectured extensively on the subject of child abuse, currently functions as the Medical Director at a child abuse shelter, and is a member of the Board of Directors of the Child Advocacy Center of Allen County, Indiana. Dr. Louis further stated that he was able to speak on the profile of a child abuser, as he has done reading on the subject and profiles have been discussed at length at many of the courses he has attended on Shaken Baby Syndrome. Over defendant's motion, the trial court qualified Dr. Louis as an expert and found that the psychological make up of a child abuse perpetrator was within his area of expertise.
 {¶ 31} Regarding the profile of a child abuser, Dr. Louis testified that several characteristics are common to almost all perpetrators. Dr. Louis testified that the abuser is someone who feels "powerless, underappreciated and overwhelmed." Dr. Louis stated that often the abuser is socially isolated and is involved with drugs or alcohol. Dr. Louis also testified that only about one-third of perpetrators of Shaken Baby Syndrome are female and those tend to be the primary caretakers. During closing arguments, the state alluded to this testimony by comparing the appellant and her situation to the profile offered by Dr. Louis.
 {¶ 32} Although appellant claims that Dr. Louis had no specialized training in child abuse profiling, we find that Dr. Louis's qualifications set forth in his testimony were sufficient for the trial court to conclude that child abuse profiling was in his area of expertise. Moreover, Dr. Louis's testimony related to matters beyond the knowledge of laypersons, as required by Evid.R. 702. Therefore, we do not find that the trial court abused its discretion in allowing Dr. Louis's testimony on the subject of child abuse profiling.
 {¶ 33} Appellant's third assignment of error is overruled.
Assignment of error No. IV
 The Defendant was denied effective representation by competentcounsel.
 {¶ 34} The Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean that a criminal defendant is entitled to the "reasonably effective assistance" of counsel. Strickland v. Washington (1984), 466 U.S. 668, 687. In order to prove the ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was in fact deficient, i.e., not reasonably competent, and (2) such deficiencies prejudiced the defense so as to deprive the defendant of a fair trial. Id.
 {¶ 35} When considering whether counsel's representation amounts to a deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id.
 {¶ 36} Appellant claims that she was denied effective representation because defense counsel failed to object to a juror continuing on the case after it was discovered the juror had a conversation prior to the trial with Katrina's grandmother, Joyce Runyon, regarding Katrina's injuries. The appellant asserts that the entire jury was affected by this juror's bias and the jury was thereby prejudiced against the appellant. Appellant argues that no reasonable trial strategy existed to justify defense counsel's action.
 {¶ 37} On the first day of trial, Juror Amy McConn informed the bailiff that she had realized she had a conversation with one of the morning's witnesses, Joyce Runyon. The court brought McConn into chambers and she related that the conversation arose as a result of McConn being offered a loan officer position at Wells Fargo bank, where Joyce was employed. The bank president asked Joyce to take McConn to lunch to answer questions about the job and the bank in general. During the course of the lunch, McConn asked Joyce about the flexibility of Wells Fargo when employees had to deal with personal issues or leave work unexpectedly. Joyce answered that she had a grandchild who had been very sick over the summer and that the bank was very flexible in allowing her to care for her grandchild. Joyce also mentioned there was a lawsuit and that there had been accusations of abuse.
 {¶ 38} After this explanation, the court asked McConn if she could still be a fair and impartial juror in the case. McConn answered affirmatively. McConn was then questioned by the state and by defense counsel. Defense counsel asked if McConn would be able to render a decision that would be adverse to Joyce's interest, to which McConn replied that she could.
 {¶ 39} After discussion with both attorneys, the court stated that either side had the right to exercise a preemptory challenge to McConn's presence on the jury. The state made no objection. After defense counsel consulted with appellant, the decision was made that the juror would remain.
 {¶ 40} After reviewing the record, we find that appellant has not shown that juror McConn could not have been a fair and impartial juror because she had prior contact with a witness nor has the appellant provided evidence that the jury was biased by the prior contact. In fact, McConn stated that she had not disclosed her prior conversation to any of the other jurors. Moreover, tactical decisions may not be the basis of determination of ineffective assistance of counsel, absent a demonstration of prejudice. See Strickland v. Washington
(1984), 466 U.S. 668. We find that appellant has made no showing of prejudice in this case.
 {¶ 41} Accordingly, appellant's fourth assignment of error is overruled.
 {¶ 42} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 Shaw, P.J., and Bryant, J., concur.
[1] Subdural hematoma refers to a condition in which there is blood between the brain and the skull.