OPINION
{¶ 1} Defendant-appellant, Douglas L. McMullen, appeals his conviction following a jury trial in the Butler County Court of Common Pleas for two counts of felonious assault and one count of improperly discharging a firearm at or into a habitation.
 {¶ 2} Appellant was indicted for discharging a firearm at or into 134 Twin Lakes Drive, the residence of Abby Fox, and at persons occupying Fox's residence, during the early morning hours of June 27, 2004. The facts and events leading up to the shooting at Fox's home, and to appellant's indictment, are as follows:
 {¶ 3} At approximately 6:00 p.m. on June 26, 2004, Fox and her friend, Emily Palmer, met appellant and his friend, Bobby Wolfram. Appellant and Wolfram picked the two girls up and the four drove to a liquor store where they purchased vodka. They then drove to Wolfram's house.
 {¶ 4} Conflicting testimony was presented at trial concerning what transpired at Wolfram's house. Appellant and Wolfram testified that everyone drank the vodka. Palmer admitted to drinking some of the vodka, but testified that Fox did not drink. Fox denied drinking. Appellant and Wolfram testified that at some point in the evening both females performed oral sex on both of them. Fox denied engaging in sexual activity, but testified that Palmer did. Palmer denied that she performed oral sex on either appellant or Wolfram. Fox also testified that appellant and Wolfram displayed handguns at some point in the evening. Appellant and Wolfram denied they possessed firearms, and Palmer could not remember when, or if, the two males displayed handguns that evening.
 {¶ 5} Anthony Elliot, Fox's boyfriend at the time, called Fox on her cell phone while she was at Wolfram's. Wolfram answered the call, however, and spoke with Elliot. According to Wolfram, he joked with Elliot about Fox now being his girlfriend. Fox testified that she also spoke to Elliot after Wolfram, and that she made plans to see him later that evening.
 {¶ 6} According to appellant, Wolfram, and Palmer, at approximately 11:00 or 11:30 p.m., Wolfram's mother interrupted the gathering and ordered them to take the girls home. Appellant and Wolfram testified that they then took the girls to the entrance to Fox's condominium complex and dropped them off. According to Fox, however, Wolfram's mother did not interrupt the gathering, and according to both Fox and Palmer, appellant and Wolfram took them all the way to the front of Fox's condominium.
 {¶ 7} According to Fox and Palmer, Elliot, and two of his cousins were outside the condominium when they arrived. The girls exited the vehicle and went into Fox's home along with Elliot and his cousins. All five then went upstairs to Fox's room where they began watching television and talking. Fox and Elliot both testified that at some point the two began to argue. Neither Fox nor Elliot recalled the nature of the argument, but the argument caused Elliot to become angry and leave to go outside. Fox and Palmer followed.
 {¶ 8} Elliot testified that when he opened the door to go outside, he saw a vehicle parked about 20 feet in front of him with its headlights off. He stepped outside, stood on the doorstep, and closed the door behind him. He then heard and saw gunshots coming from the driver and passenger sides of the vehicle. Elliot further testified that he immediately opened the door to re-enter Fox's condominium. As he did so, he saw the driver, whom he identified at trial as appellant, and he saw a shot come from the driver's side and go through the front door.
 {¶ 9} Fox testified that she heard gunshots while inside, though she did not know they were gunshots at the time, and that as Elliot came back inside, she went outside to see what was occurring. Fox further testified that outside she saw appellant shooting from the driver's side of a vehicle; there were two people in the vehicle, and its headlights were turned on. Fox immediately ran back inside. As she did, a bullet hit the front door, and a piece of metal from the front door struck her in the leg.
 {¶ 10} Police officers who investigated the shooting testified that bullet casings were found outside Fox's residence, and that a bullet was found in the door jam in the kitchen of Fox's home. Detective Doug Day questioned Wolfram, Fox, and Elliot, and thereafter obtained a search warrant for appellant's residence and vehicle, but no weapon or other tangible evidence tying appellant to the shooting was found.
 {¶ 11} Fox also testified that she saw appellant outside Wolfram's house sometime in October and that appellant apologized to her and asked her not to go to court. Ashley Mulholland, a friend of Fox's, was also present and testified at trial that she heard appellant apologize.
 {¶ 12} Appellant testified that after dropping the girls off at the entrance to Fox's complex, he took Wolfram to his residence, then went home. Appellant also admitted to apologizing to Fox some time after the shooting. He claimed, however, that he was not apologizing for shooting at Fox, but for engaging in sexual activity with her because she was only 15 at the time.
 {¶ 13} Appellant's wife, Amber McMullen, appellant's sister, Victoria Denmark, Wolfram, Demetrius Glasier, and Linda Ferguson also testified at trial on behalf of appellant. Amber and Denmark testified that they were with appellant at home at the time of the shooting. Wolfram testified that after dropping Fox and Palmer off at Fox's complex, appellant drove him home. He further testified that he spoke with appellant on the phone approximately one half to one hour later to make sure appellant arrived home safely.
 {¶ 14} Glasier, who was a boyfriend of Fox in the fall of 2004, testified that he, appellant, and Fox drove to Dayton together in September or October of 2004. According to Glasier, Fox stated during the trip to Dayton that she thought enemies of Elliot had shot at them, not appellant. Ferguson lived in Dayton; she testified that around October of 2004, appellant, Glasier, and Fox came to visit her.
 {¶ 15} On June 3, 2005, after a two-day trial, the jury found appellant guilty on all charges. On July 14, 2005, appellant moved for a new trial on the basis that new witnesses were available that were not available at the time of trial. The trial court denied the motion for a new trial. An appeal to this court followed, in which appellant raises three assignments of error
 {¶ 16} Assignment of Error No. 1:
 {¶ 17} "THE JURY VERDICT WAS UNSUPPORTED BY THE EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 18} In his first assignment of error, appellant contends the verdict was based upon insufficient evidence and against the weight of the evidence.
 {¶ 19} To begin, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct. In reviewing the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Allen, 73 Ohio St.3d 626, 630, 1995-Ohio-283;State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 20} In reviewing the evidence to determine whether a jury verdict is against the manifest weight of the evidence, a court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52. Weight is not a question of mathematics, however, but depends on its effect in inducing belief. Id. Accordingly, while this court makes an independent review of the evidence, we must also bear in mind that the trial court, not an appellate court, is in the best position to evaluate testimony and determine the credibility of witnesses. State v. DeHass (1967), 10 Ohio St.2d 230; State v.Thompson, Clinton App. No. CA2003-10-025, 2004-Ohio-6244, ¶ 8.
 {¶ 21} Appellant was convicted of two counts of felonious assault in violation of R.C. 2903.11(A), which provides:
 {¶ 22} "No person shall knowingly do either of the following:
 {¶ 23} "(1) Cause serious physical harm to another or to another's unborn;
 {¶ 24} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 25} Appellant was also convicted for the offense of discharging a firearm at or into a habitation in violation of R.C. 2923.161(A), which provides:
 {¶ 26} "No person, without privilege to do so, shall knowingly do any of the following:
 {¶ 27} "(1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual * * *."
 {¶ 28} After thoroughly reviewing the record, we find that the state presented sufficient evidence from which a rational jury could have found the essential elements of the foregoing crimes beyond a reasonable doubt. The state offered eyewitness testimony that appellant was outside Fox's condominium on the night in question, and that appellant discharged a firearm at or into Fox's condominium, an occupied structure serving as a habitation. The eyewitness testimony also provided sufficient evidence from which the jury could have concluded that appellant attempted to cause serious physical harm to Elliot and Fox by discharging a firearm at them while they were standing outside Fox's condominium. In addition, the state's eyewitness testimony was also corroborated by testimony from police officers that shell casings were found outside Fox's residence, and further corroborated by officer testimony that a bullet was found lodged inside Fox's home.
 {¶ 29} We also find that appellant's conviction was not against the manifest weight of the evidence. The state's case rested primarily upon the testimony of Fox, Palmer, and Elliott. In this case the jury chose to credit the testimony of the state's witnesses over that of appellant, his alibi witnesses, and the witnesses who testified that Fox admitted to them appellant was not the perpetrator of the crimes. Unless the testimony of the state's witnesses was completely lacking in credibility, which it was not, this court will not overturn the jury's decision to believe the state's witnesses over appellant and his witnesses. See State v. Bates (Mar. 30, 2001), Portage App. No. 99-P-0100, 2001 WL 314855 (holding the credibility of a witness is the critical issue for the jury to decide and will not be reversed unless the testimony is completely lacking in credibility). A conviction is not against the manifest weight of the evidence simply because the jury chose to believe the prosecution testimony. See State v. Guzzo, Butler App. No. CA2003-09-232, 2004-Ohio-4979, ¶ 13.
 {¶ 30} Appellant contends, nevertheless, that there were major inconsistencies in the testimony of the state's witnesses, and that in light of those inconsistencies, no rational jury could have found him guilty. Specifically, appellant points out that Elliot and Fox contradicted each other over whether the vehicle outside Fox's condominium had its headlights on, and over whether the driver of the vehicle was using his left or right arm to shoot at them. Further, appellant contends, the laws of physics contradicted both Fox and Elliot's testimony about how the driver shot his firearm while driving away from Fox's residence. Finally, appellant points out that Elliot testified Fox did not go outside after the shooting began, completely contradicting Fox's assertion that she went outside to see what was going on while Elliot was hurrying to get back inside.
 {¶ 31} We find, after carefully considering the testimony of the state's witnesses as a whole, that its consistency far outweighs any inconsistencies. Moreover, inconsistencies in the evidence alone do not render a verdict against the manifest weight of the evidence. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and to determine whether the witnesses' testimony is credible. State v. Schmitz, Franklin App. No. 05AP-200, 2005-Ohio-6617, ¶ 10. Accordingly, appellant's contention that inconsistencies in the testimony of the state's witnesses rendered his conviction against the weight of the evidence is not well-taken.
 {¶ 32} The first assignment of error is overruled.
 {¶ 33} Assignment of Error No. 2:
 {¶ 34} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR A NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE."
 {¶ 35} In his second assignment of error, appellant contends the trial court erred when it denied his motion for a new trial based upon newly discovered evidence.
 {¶ 36} The decision "to grant or deny a motion for a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed." State v.Hawkins (1993), 66 Ohio St.3d 339, 350. "An abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Jackson, 107 Ohio St.3d 53, 89,2005-Ohio-5981, ¶ 181; State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 37} To prevail on a motion for a new trial on the grounds of newly discovered evidence, the movant must establish that the new evidence: "(1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." State v. Petro (1947), 148 Ohio St. 505, syllabus.
 {¶ 38} At the hearing on the motion, appellant offered the testimony of five new witnesses. Chris Litschi met appellant in jail. Litschi testified that Fox told him somebody named Doug had been arrested for "shooting her house up," but "he didn't do it." Krystal Jackson, appellant's sister-in-law, testified that she was once Fox's best friend, and that Fox told her she lied at trial. Jackson further testified that Fox told her it was really a guy named Karl Thomas who shot at Elliot over drugs. Fox, according to Jackson, needed someone to blame it on.
 {¶ 39} Joshua Bournes lived across the street from appellant. He testified he saw appellant's car outside his house at the time of the shooting at Fox's home. Derrick Chapman, a co-worker of appellant, testified that he went to appellant's house on the night of June 26-27, around the time of the shooting, and was told appellant was sleeping. He further testified that he saw appellant's car, and could see it had been there for a while because the car had frost on the hood.
 {¶ 40} Finally, Joseph Spivey testified that he knew Fox. He further testified that he was out of town during the trial, but when he returned to town, he heard Fox say appellant was not the shooter. According to Spivey, Fox said a guy named Karl Johnson was the shooter.
 {¶ 41} Fox also testified at the hearing. She denied ever telling anyone that appellant was not the shooter; she denied knowing anyone named Karl Johnson; and she reiterated that appellant was the shooter on the night of June 26-27.
 {¶ 42} After reviewing the evidence relied upon by the trial court in denying appellant's motion for a new trial, we find appellant failed to satisfy the first, third, fifth, and sixth prongs of the Petro test. The new witness testimony lacks overall credibility, indicating little probability that the result would be different if a new trial were granted. The new evidence is also cumulative of former evidence; it is merely another attempt at an alibi defense, and another attempt to discredit Fox, the state's key witness. The record also reflects that the majority of these additional witnesses were known to appellant and his family. However, the record does not reflect that the information, if true, was given to appellant's attorney. Moreover, the new evidence merely impeached or contradicted the testimony at trial that appellant was in fact the shooter at Fox's residence on the night in question. Accordingly, we find no abuse of discretion with the trial court's decision to deny the motion for a new trial.
 {¶ 43} Appellant's second assignment of error is overruled.
 {¶ 44} Assignment of Error No. 3:
 {¶ 45} "APPELLANT'S DUE PROCESS RIGHT TO LEGAL COUNSEL WAS PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 46} In his third and final assignment of error, appellant contends that he was denied his constitutional right to the effective assistance of counsel. Specifically, appellant contends that his trial counsel (1) failed to subpoena Wolfram's mother to testify that she interrupted the gathering at Wolfram's and told appellant and Wolfram to take the girls home, (2) failed to file a memorandum or affidavits in support of appellant's motion for a new trial, or a memorandum contra the state's opposition, (3) failed to provide discovery to the state, (4) failed to call two witnesses who were subpoenaed for the new trial motion hearing, and (5) failed to properly investigate and locate, prior to trial, the witnesses who did testify at the hearing on the motion for a new trial.
 {¶ 47} The Ohio Supreme Court has adopted a two-part test to determine whether an attorney's performance has fallen below the constitutional standard for effective assistance. To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard or reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding."State v. Madrigal, 87 Ohio St.3d 378, 388-389, 2000-Ohio-448, citing Strickland v. Washington (1984), 466 U.S. 668, 687-688,104 S.Ct. 2052, 2064-2065.
 {¶ 48} With respect to the first prong of the test, there are countless ways for an attorney to provide effective assistance in a given case, and this court must give great deference to counsel's performance. Strickland, 466 U.S. at 689,104 S.Ct. at 2065. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Id. With respect to the second prong, the defendant must establish "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The failure to prove either prong makes it unnecessary for a court to consider the other prong. Madrigal,87 Ohio St.3d at 389.
 {¶ 49} In the present case, we find that whether or not counsel's failure fell below an objective standard of reasonableness, appellant has failed to show that he was prejudiced by those errors. Appellant has not demonstrated a reasonable probability that but for counsel's errors, the result of his trial would have been different.
 {¶ 50} First, appellant has failed to demonstrate how testimony from Wolfram's mother that she told appellant and Wolfram to take the girls home would have affected the jury's ultimate determination. While Wolfram's mother could have contradicted Fox, who denied that Wolfram's mother told appellant and Wolfram to take the girls home, this discrepancy in testimony concerned only a minor point. Fox admitted to being present at Wolfram's house. She merely denied that Wolfram's mother interrupted the gathering and told them to leave. Given the questionable value of the testimony, we cannot say there is a reasonable probability that but for trial counsel's failure to procure a subpoena for Wolfram's mother, the result of appellant's trial would have been different.
 {¶ 51} Appellant has also failed to demonstrate how he was prejudiced by counsel's failure to provide discovery or file appropriate pleadings for the motion for a new trial. Nothing in the record indicates that appellant was sanctioned in any way for failing to comply with discovery, and appellant was granted an evidentiary hearing on the motion for a new trial in which his opportunity to present new evidence was unfettered.
 {¶ 52} Finally, appellant has failed to show how he was prejudiced by the failure to call two witnesses who were subpoenaed for the hearing on the motion for a new trial, and he has failed to show a reasonable probability that locating, prior to trial, the witnesses who testified at the hearing on the motion for a new trial would have changed the jury's ultimate decision. As noted earlier, the record does not show that the information about the existence of the majority of these witnesses was given to defense counsel by appellant or his family.
 {¶ 53} Counsel's decision not to call a witness falls under the rubric of trial strategy, and by itself does not constitute ineffective assistance. State v. Jones, Butler App. No. CA2004-06-144, 2005-Ohio-3887. In addition, appellant only speculates as to what the uncalled witnesses would have testified to at the hearing on the motion for a new trial. Speculation as to what a witness might have said at trial is not sufficient for a claim of ineffective assistance of counsel. Id.
 {¶ 54} The witness testimony at the hearing on the motion for a new trial was cumulative, merely adding to the alibi defense appellant already offered at trial. It was also contradicted by the testimony of the state's witnesses who positively identified appellant as the perpetrator of the crimes. Under these circumstances, we cannot say there was a reasonable probability the outcome of appellant's trial would have been different had counsel located and called these witnesses at trial.
 {¶ 55} Appellant's third and final assignment of error is overruled.
 {¶ 56} Judgment affirmed.
Powell, P.J., and Young, J., concur.