[Cite as *State v. Sharp*, 2014-Ohio-4140.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                    CASE NO.  12-13-01

      v.

KYLE SHARP,                                O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2012 CR 51

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   September 22, 2014

APPEARANCES:

    *Stephen A. Goldmeier*  for Appellant

    *Todd C. Schroeder*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Kyle Sharp, appeals the judgment of the Court of Common Pleas of Putnam County convicting him on two counts of unlawful sexual conduct with a minor and one count of tampering with evidence and sentencing him to a prison term of three years. On appeal, Sharp argues that the trial court committed the following errors: (1) entering verdicts that were not supported by sufficient evidence; (2) entering verdicts that were against the manifest weight of the evidence; and (3) imposing consecutive sentences. For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On June 11, 2012, the Putnam County Grand Jury indicted Sharp on two counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) and (B)(1), felonies of the fourth degree; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.

{¶3} The trial of this matter commenced on December 17, 2012, and ended on December 18, 2012. At the trial, evidence was presented that on September 29, 2009, Sharp and C.S., who was at the time 15-years-old, met at the annual Continental Fall Festival. Sharp and C.S. met in a parking lot and eventually entered Sharp's truck where they talked and then had sexual intercourse.

{¶4} G.R. testified that she met Sharp through her older brother, Aaron Sherry, and that Aaron and Sharp were best friends. After going to a movie with

Aaron and Sharp, G.R. asked her brother for Sharp's phone number. G.R. testified that sometimes she and Sharp would send text messages to each other about "normal things" but other times they would text about "sexual things." Trial Tr., Volume I, p. 63. On March 11, 2012, G.R. went over to Aaron's apartment in Continental. She knew that Sharp would be there and that her brother and Sharp were going to go out drinking that night. After Sharp and Aaron came home that night, Aaron went straight to his room and fell asleep. There were inconsistent statements as to when Sharp and Aaron came home that morning. G.R. and Aaron testified that it was around 5:00 a.m., whereas Sharp testified that he did not go back to Aaron's apartment until 7:00 or 7:15 a.m. Sharp and G.R. went to the spare bedroom and G.R. testified that Sharp digitally penetrated and then had sexual intercourse with her. G.R. also stated that Sharp used a condom.

{¶5} After Sharp and G.R. had sexual intercourse, G.R. testified that Sharp told her not to tell anyone what had happened because he could not handle jail. G.R. testified that the last text message she received from Sharp was on March 12, 2012. Shortly after this occurred, G.R.'s mother found out about her daughter's sexual relationship with Sharp and reported it to the police.

{¶6} After Aaron found out about G.R.'s allegations he confronted Sharp in mid-April. Aaron testified:

> I went to the bar right after work that Thursday night, and he was there and everything. I couldn't hold it back or anything because he

was my best friend. So I wanted to know straight from him one on one. So we went back into the empty kitchen, and we had a conversation, and I let him know, you know, cops are coming, mom went crazy and that. From brother to brother to best friend to best friend, did anything happen. * * * And he told me no, didn't happen.

* * *

Text -- I asked if there was [sic] text messages going back and forth. He told me if they go by those, he would be in trouble since he already knew from a prior thing that that's how they got -- they got another person.

Trial Tr., Volume II, p. 47.

{¶7} Aaron also had the following relevant exchange:

Q:    And from time to time, would you and the Defendant and your circle of friends hang out?

A:    Yes.

Q:    And sometimes, would that involve consuming alcohol?

A:    Yes.

Q:    And from time to time, would it be brought up that the Defendant had sex with [C.S.]?

A:    Once or twice.

Q:    And you were present for that?

A:    Yes.

Q:    And would the Defendant respond to that?

A:    No.

-4-

Q: Would he have any sort of reaction?

A: No. Never, I guess no, nothing like that. Never came out of his mouth.

Q: Would he smile or smirk?

A: Yes.

Q: On all those occasion in which it was brought up of the Defendant having sex with [C.S.], did he ever deny it?

A: No.

*Id.* at p. 39.

{¶8} Dr. Randall Schilveret, director of the child abuse program for Mercy Healthy Partners in Toledo, Ohio also testified for the State. Dr. Schilveret testified that G.R. came to his office on April 2, 2012. He learned that G.R. had sexual intercourse with Sharp and asked her if he could perform a physical exam on G.R. At that time, G.R. refused a physical exam. However, G.R. later returned to Dr. Schilveret's office and consented to a physical exam. Dr. Schilveret testified that G.R.'s exam came back normal. He explained that

> [a] normal exam just means -- when I say that, that looking at the patient, the tissues look entirely normal. There's no sign of disease. There's no sign of scar or abnormality. And then it's important that I always relay to the patient or parents why that's very common in cases of sexual assault and that it's not an issue that is uncommon in my practice or in the literature for that exam to be normal even when there's been penetration or sexual assault.
>
> * * *

But it's well documented in my experience as well just the medical literature that most of the kids you see, unless it just happened within the last few hours, maybe a week, are going to be a completely normal exam.

And there's [sic] a couple of reasons for that. One of those reasons is that if the child is older, pubertal, meaning they're having their periods and fully developed, those tissues stretch much more easily than if they were five or six years old.

Trial Tr., Volume I, p. 123-124.

{¶9} On May 7, 2012, the police executed a search warrant for Sharp's phone. On May 25, 2012, police officers executed a second search warrant for a micro SD card for Sharp's phone. However, police officers were not able to recover the SD card. Deputy Steven Mueller of the Defiance County Sheriff's Office[1] testified that he was asked to provide an analysis of Sharp's cell phone and G.R.'s cell phone. He testified that Sharp's phone has a setting that will only retain 200 texts in a conversation. Thus, older text messages might be automatically deleted in a conversation. When performing an analysis of Sharp's phone, Deputy Mueller could not find any data on the phone. Deputy Mueller stated that this was unusual and is most likely attributable to human intervention.

{¶10} Ethan Bollenbacher, a custodian of records for Verizon Wireless, also testified for the State. Bollenbacher explained that he confirms call records on behalf of Verizon Wireless and generated a "call detail record" of Sharp's phone. The call detail record includes all incoming and outgoing phone calls

---

[1] Deputy Mueller was qualified as an expert witness in digital evidence collection.

made from Sharp's phone. The record shows the date and time stamp of each phone call. Bollenbacher also produced a "message detail log" which shows all of the incoming and outgoing text messages associated with Sharp's phone number. The message detail log also contains the date and time stamp associated with each text message, but does not include the content of the text message. Bollenbacher explained that Verizon Wireless only keeps the content of a text message for three to five days before they are purged. These records were offered and then later admitted into evidence.

{¶11} After the State rested, Sharp moved for acquittal under Crim.R. 29, but the trial court denied the motion.

{¶12} Sharp called Alex Thiel and Hallie Garofalo, who both worked at the Bureau of Criminal Investigation. Both witnesses testified that they analyzed evidence submitted to them by the Continental Police Department; specifically, bed sheets and pillow cases. Both witnesses testified that neither Sharp's nor G.R.'s DNA was found on the sheets. However, both witnesses admitted that if an individual wore a condom, they would not expect to find semen on the bed sheets.

{¶13} John Sharp then testified. John testified that Sharp is his cousin and that he was with Aaron and Sharp the night of March 10th and 11th. John stated that after going to a local bar, he, Sharp, and Aaron went to a friend's garage to

continue drinking. They left their friend's house as the sun was rising, around 6:30 or 7:00 a.m.

{¶14} Sharp testified on his own behalf. He denied C.S.'s and G.R.'s allegations. Sharp corroborated John's testimony, testifying that on the night of March 10th and 11th he went out drinking with Aaron and John, first at a bar and then at a friend's house. Sharp also testified that they left the friend's house around 6:30 or 7:00 a.m. Sharp dropped John off at his car, and then followed John to make sure he got home and did not get back to Aaron's apartment until 7:15 or 7:30 a.m.

{¶15} Sharp claimed that G.R. would flirt with him but he never thought anything of it. He stated that G.R. was the one who initiated the text messages. At first, the messaging was just "normal chitchat," *id.* at p. 111, but then G.R. began to talk "about her virginity and just the things that she said that she wanted to do," *id.* at p.117. Sharp stated he was not made aware of the allegations against him until Aaron pulled him aside about a month after the alleged incident. Sharp denied the allegations to Aaron. Sharp told Aaron that his sister had "massive interest" in him, which is why Sharp stopped talking to G.R. *Id.*

{¶16} Sharp was arrested on May 4, 2012, but was released on May 7, 2012. Sharp testified that he got picked up from jail by his mother, who immediately informed him that "the cops were going [to] stop at the house to take

[his] cell phone." *Id.* at p. 113. Once he got home, Sharp realized his cell phone was dead, so he charged his phone and "grabbed the SD off my computer stand, [and] put it in my phone." *Id.* "No later than ten minutes later, the cop was there to take my phone." *Id.* According to Sharp he gave the police officers everything he had regarding his phone. However, police officers came back to his house and alleged that the SD card he supplied them was not the right one for his phone. Sharp allowed police officers to look in his house for the correct SD card, but officers could not locate a second SD card.

{¶17} Sharp also denied the allegations against him concerning C.S. Sharp testified that he did meet up with C.S. at the 2009 Continental Fall Festival. Sharp stated that at the festival, C.S. was on crutches and she asked him for a ride to a friend's house. Feeling bad for C.S., Sharp obliged and drove her down the street. Sharp was unaware of any motive C.S. would have to lie to police officers about the accusations.

{¶18} On cross-examination, Sharp had the following relevant exchange:

Q: Your phone log record reveals that on March 30th, 2012, the Continental police made contact to your phone to attempt to speak to you about this incident. Do you recall receiving a message?

A: Yes.

Q: And so if you received that message on March 30th, 2012 and spoke to Aaron the first week in April, when you spoke to him, you already had a heads up about what was coming?

A:  No.  I didn't know why the cops was [sic] calling me.

* * *

Q:  And you received that message from the Continental Police Department, correct?

A:  Yes.

Q:  And in fact, you were aware that the Continental Police Department continued to make multiple attempts to contact you. Isn't that correct?

A:  Yes.

Q:  And in fact, you would agree that attempts were made to contact you via your cell phone by calling and leaving voicemail messages not just on March 3[0th] but also on April 2nd, April 9th, April 13th, April 17th, April 18th, and April 20th.  Would that be correct?

A:  Yes.

Q:  And if your phone log record reflected that, would you agree that that's accurate?

A:  Yes.

*Id.* at 141-143.  Police officers also went to Sharp's home, but Sharp claimed that he was not at home the multiple times officers went there to question him.

{¶19} Sharp then testified:

Q:  The jail records reflect you were released May 7th, 2012 at 3:45 p.m.

A:  That's correct.

Q: How long does it take to drive from Putnam County jail to your home?

A: Depends on traffic lights, but roughly half hour.

Q: Thirty minutes?

A: Yeah.

Q: And it was during that drive that you were told police were coming for the cell phone?

A: Yes.

Q: And so you would have returned home, if it took 30 minutes, about 4:15?

A: If we didn't stop anywhere to eat or anything.

Q: Well, let's say you did. You would have returned home at 4:30?

A: Yes.

Q: And then law enforcement arrived at 5:40, correct?

A: Is that what the paper says?

Q: Yes.

A: Then yes.

*Id.* at p. 146-147.

{¶20} After Sharp's testimony, the defense rested. Sharp renewed his Crim.R. 29 motion for acquittal, which the trial court again denied. Both the State

and Sharp offered their closing statements and the trial court charged the jury before deliberations.

{¶21} On December 18, 2012, the jury returned guilty verdicts on all three counts alleged in the indictment.  This matter then proceeded to sentencing on January 14, 2013.  After hearing evidence and argument relating to the issue of punishment, the trial court imposed the following sentence:  18 months in prison for each of the two counts of unlawful sexual conduct with a minor and a 36-month prison sentence for the one count of tampering with evidence.  The trial court further ordered that the two counts of unlawful sexual conduct with a minor run consecutively, while the tampering with evidence count run concurrently.  As such, the trial court imposed a total prison term of three years.  On January 18, 2013, the trial court issued a judgment entry journalizing Sharp's conviction and sentence.

{¶22} Sharp timely appealed this judgment, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**MR. SHARP'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS.**

*Assignment of Error No. II*

**MR. SHARP'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED WHEN IT SENTENCED MR. SHARP TO CONSECUTIVE SENTENCES WITHOUT COMPLYING WITH R.C. 2929.14, IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.**

*Assignment of Error No. I*

**{¶23}** In his first assignment of error, Sharp argues that the State failed to present sufficient evidence to support his convictions. We disagree.

*Sufficiency Standard*

**{¶24}** When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a

verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

*Sharp's Unlawful Sexual Conduct Convictions*

{¶25} R.C. 2907.04(A) sets forth the offense of unlawful sexual conduct and states "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."

{¶26} As set forth under the statute, the State must prove that (1) the offender is over the age of eighteen years; (2) the victim was between the ages of thirteen and sixteen at the time of the sexual conduct, and (3) the victim was not the offender's wife. On appeal, Sharp does not challenge that he was eighteen years old and that both C.S. and G.R. were between the ages of thirteen and sixteen when the alleged sexual conduct occurred. He only argues that the State failed to present any evidence that either C.S. or G.R. was not his wife.

{¶27} Although the State failed to affirmatively ask C.S. or G.R. whether they were the spouse of Sharp, there was sufficient circumstantial evidence presented to allow the jury to determine that Sharp and his victims were not married. *See State v. Smith*, 12th Dist. Warren Nos. CA2012-02-017, CA2012-02-

018, 2012-Ohio-4644, ¶ 39 (finding that circumstantial evidence can be used to establish the victim was not the spouse of the offender).

**{¶28}** C.S. testified that she was not supposed to tell anyone about her relations with Sharp. C.S. acknowledged that what transpired between her and Sharp was wrong, but she was scared to go to the police. Further, G.R. did not characterize Sharp as her husband, but instead, as her older brother's best friend. Aaron's testimony substantiated this as he described Sharp as his best friend, not his little sister's husband. While G.R. knew that Sharp was older than her, she did not know his exact age. G.R. testified that after Sharp took her virginity, Sharp stopped texting her altogether. Moreover, when Sharp took the stand, he denied having any sexual relations with C.S. or G.R., which further supports the fact that he was not their husband. From such testimony, there was sufficient circumstantial evidence for the jury to determine that neither C.S. nor G.R. was Sharp's spouse.

*Sharp's Tampering with Evidence Conviction*

**{¶29}** R.C. 2921.12(A)(1) states that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *." Thus, there are three elements of this offense:

"(1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, [and] (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶ 11.

**{¶30}** Sharp argues that there is no evidence that he was the person who actually deleted the text messages to G.R. from his phone. Instead, Sharp contends that his phone will automatically delete older text messages, which explains why the police could not find any text messages between G.R. and Sharp on his phone. We find this argument unconvincing. There were no messages on the phone at all between Sharp and G.R. Whether the program erased older messages in a conversation does not explain how the most recent were deleted. Further, Sharp admitted to Aaron that if anybody saw the text messages he "would be in trouble * * *." Trial Tr., Volume II, p. 47. When asked if Aaron could see the text messages, Sharp admitted they were already deleted. *Id*. at p. 48. Thus, Sharp's admission is sufficient evidence that he deleted the text messages on his phone.

**{¶31}** Sharp argues that even if he did delete the text messages, the State failed to prove that he did it with the purpose to interfere with the ongoing investigation. Specifically, Sharp argues that there was no evidence that he knew

an investigation was ongoing or likely to occur. Sharp contends that he did not know an investigation was ongoing until Aaron confronted Sharp in mid-April. Sharp claims at this point, he had already deleted all the text messages on his phone. However, Sharp ignores the evidence presented that showed he received multiple phones calls from the Continental Police Department on March 30, April 2, April 9, April 13, April 17, April 18, and April 20. After every attempt to contact Sharp, police officers left voicemails on Sharp's phone. Sharp also acknowledged that the police officers stopped by his residence on March 27, March 28, March 29, March 30, April 2, April 5, and April 9; however, he conveniently was never home during any of the visits.

{¶32} Moreover, Sharp realized that his communications with G.R. were inappropriate and confided in Aaron that if police officers saw the text messages, he would be in trouble. He told G.R. not to tell police officers about their relationship, and also told her that he would not be able to handle jail if he were caught. Thus, when viewed in a light most favorable to the State, there is sufficient evidence in the record to demonstrate that Sharp was aware that a criminal investigation was likely to occur, if not already in progress.

{¶33} Based on the foregoing evidence, we find that there was sufficient evidence in the record to support Sharp's two convictions for unlawful sexual conduct and his conviction for tampering with evidence.

{¶34} Accordingly, we overrule Sharp's first assignment of error.

*Assignment of Error No. II*

{¶35} In his second assignment of error, Sharp argues that his convictions were against the manifest weight of the evidence. We disagree.

*Standard of Review*

{¶36} Although we have concluded that there was sufficient evidence to support Sharp's convictions, our finding in that regard does not foreclose the possibility that the convictions were against the manifest weight of the evidence. *See Thompkins*, 78 Ohio St.3d at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the manifest weight of the evidence."). When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Id.* Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a

trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

{¶37} Moreover, "A conviction is not against the manifest weight of the evidence simply because the jury chose to believe the prosecution testimony." *State v. McMullen*, 12th Dist. Butler Nos. CA2005-09-414, CA2005-10-427, CA2005-10-429, 2006-Ohio-4557, ¶ 29. Instead, this court may only overturn a jury's decision of the State's witnesses were "completely lacking in credibility * * *." *Id.*; *see also State v. Bates*, 11th Dist. Portage No. 99-P-0100, 2001 WL 314855, *9 (Mar. 30, 2001).

*Recapitulation of Evidence*

{¶38} C.S. testified that in September of 2009, she and Sharp were together at the Continental Fall Festival. C.S. stated that Sharp knew how old she was because she told him that she was 15-years-old. In an attempt to get alcohol, C.S. texted Sharp and they met up in a parking lot. After Sharp gave her alcohol, the two went into his truck. C.S. testified at first they talked, but eventually it "led to more" and they had sexual intercourse inside of Sharp's truck. Trial Tr., Volume I, p. 35. Aaron also testified that he was with Sharp when friends would bring up the fact that Sharp had sex with C.S. Aaron testified that Sharp never denied the allegations and instead, Sharp would smile or smirk. Trial Tr., Volume II, p. 39. Moreover, Sharp's own testimony corroborated C.S.'s testimony. Sharp admitted

that he met C.S. at the Continental Fall Festival in September of 2009, and that she was in his truck. However, Sharp denied that they had sexual intercourse and insisted he only gave C.S. a ride to her friend's house. *Id.* at p. 118.

{¶39} As to G.R., she testified that on March 12, 2012, Sharp digitally penetrated and then had sexual intercourse with her. After having sexual intercourse with G.R., Sharp told her that she could not tell anyone about what had happened because he would not be able to handle going to jail. G.R. also testified that she and Sharp had been texting for a month prior to the incident and that some of their conversations were sexual in nature. Sharp admitted to texting G.R., and told Aaron that if the police found out about the text messages he would be in trouble. Sharp's testimony also corroborated G.R.'s version of events. He confirmed that he spent the night at Aaron's place and that G.R. was up when he returned with Aaron in the early morning hours. While Sharp does not deny texting G.R., he did deny that any of the text messages were inappropriate on his end. Instead, he testified that G.R. was the one who was inappropriate and he was uncomfortable with the conversation.

*Sharp's Arguments*

{¶40} On appeal, Sharp contends that his convictions should be overturned because there were inconsistencies in the testimony of the State's witnesses, and as a result, no reasonable juror could have found them credible. Specifically,

Sharp argues that G.R.'s testimony was incredible because she testified that Sharp returned to Aaron's apartment around 5:00 a.m., even though cell phone records show that they were exchanging text messages until 5:45 a.m. Further, Sharp points out that G.R. testified that the sun had not yet risen when Aaron and Sharp returned home, even though Sharp and his cousin testified that it was 6:30 a.m. when they returned to Aaron's and it was light outside.

{¶41} We do not find that G.R.'s testimony was incredible because she confused the time that she and Sharp had sexual intercourse. G.R. testified that it happened "*About* 5 o'clock in the morning." (Emphasis added.) Trial Tr., Volume I, p. 65. She then later stated that she and Sharp had sexual intercourse after Sharp had sent her a text message at 5:45 a.m. On cross-examination, G.R. stated:

> Q: And then what time do you recall [Sharp and Aaron] coming back home?
>
> A: About 5 o'clock or so.
>
> Q: In the morning?
>
> A: Yeah.
>
> Q: Are you sure it was 5 o'clock in the morning?
>
> A: I'm not sure it was 5 o'clock, but it was in the morning.
>
> Q: And was the sun up?
>
> A: No.

*Id.* at p. 96-97. G.R.'s testimony was supported by Aaron who similarly testified that he returned home with Sharp around 5:00 a.m. G.R. also told police officers that the sexual intercourse happened around 6:00 a.m.

{¶42} Further, we find more inconsistences with Sharp's testimony than with G.R.'s. First, Sharp testified that only 10 minutes had passed from the time he got home from jail to when police officers came to his house to confiscate his phone. However, on cross-examination he admitted that he was released from jail at 3:45 p.m. and that police officers did not arrive at his house till 5:40 p.m. Second, Sharp testified that he did not send any inappropriate text messages to G.R., yet he admitted to Aaron that if police officers saw his text messages to G.R. he would get in trouble. Moreover, Sharp's credibility is undermined by the fact that when he did eventually hand over his phone to police officers, he had completely cleared the phone of any text messages, phone calls, or voicemails. Lastly, Sharp's credibility was called into question again when he never denied sleeping with C.S. when asked by his friends.

{¶43} "It is well-established that '[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.' " *State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11, quoting *State v. Bromagen*, 12th Dist. Clermont No. CA2005-09-087, 2006-Ohio-4429, ¶ 38. Further, the

credibility of witnesses is primarily an issue for the trier of fact. *State v. Payne*, 3d Dist. Hancock No. 5-04-21, 2004-Ohio-6487, ¶ 15. Accordingly, this court must afford the decision of the trier of fact the appropriate deference when considering such credibility issues. We will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently clear that the fact finder lost its way. *Payne* at ¶ 15; *see also State v. Parks*, 3d Dist. Van Wert No. 15-03-16, 2004-Ohio-4023, ¶ 13.

**{¶44}** The trier of fact was in the best position to hear all of the witnesses' testimony, observe the witnesses, and determine their reliability. Further, our review of the record before us casts serious doubts on whether Sharp's version of events was entirely credible. We cannot say that the jury clearly lost its way in believing the State's witnesses over Sharp.

**{¶45}** Sharp also argues that the lack of physical evidence is another reason to overturn the jury's verdict. However, the lack of physical and medical evidence to corroborate G.R.'s allegations is not fatal here since such evidence is not required to sustain a sex offense conviction. *E.g.*, *State v. Branch*, 3d Dist. Allen No. 1-12-44, 2013-Ohio-3192, ¶ 110-112 (rejecting manifest weight of the evidence challenge of gross sexual imposition convictions that were partially predicated on lack of physical evidence).

{¶46} In conclusion, based on our review of the record, we are unable to find that Sharp's convictions are against the manifest weight of the evidence.

{¶47} Accordingly, we overrule Sharp's second assignment of error.

*Assignment of Error No. III*

{¶48} In his third assignment of error, Sharp contends that the trial court erred when it failed to make the statutorily required findings before imposing consecutive sentences. We agree.

{¶49} The revisions to the felony sentencing statutes under H.B. 86 now require a trial court to make specific findings on the record, as set forth in R.C. 2929.14(C)(4), when imposing consecutive sentences. *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11. Specifically, R.C. 2929.14(C)(4) now provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender *and* that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, *and* if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Emphasis added.)

**{¶50}** Moreover, the Ohio Supreme Court has recently held that a trial court must state the required findings at the sentencing hearing as well as incorporate the statutory findings into the sentencing entry. *State v. Bonnell*, --- Ohio St.3d---, 2014-Ohio-3177, ¶ 29. "However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.*

**{¶51}** We cannot discern from the record that the trial court made any of the three statutorily required findings. When imposing Sharp's sentence, the trial court merely stated that "the harm as to Counts 1 and 3 is so great that a single term does not adequately reflect the seriousness of the conduct. As a result, I am ordering that Counts 1 and 3 be a consecutive sentence." Sentencing Tr., p. 8. While, it appears that the trial court was attempting to make the finding under R.C.

2929.14(C)(4)(b), the trial court never found that Sharp's two unlawful sexual conduct convictions were part of a course of criminal conduct. Moreover, the trial court never addressed the proportionality of consecutive sentences to the seriousness of Sharp's convictions and the danger he posed to the public.

{¶52} Thus, the court's mere finding that the harm caused in this case was great[2] does not permit us to conclude that the trial court made the statutory findings that are required by R.C. 2929.14(C)(4).

{¶53} Accordingly, we sustain Sharp's third assignment of error.

{¶54} Having found no error prejudicial to Sharp in the first or second assignments of error, but having found error prejudicial to Sharp in the third assignment of error, we affirm in part and reverse in part the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW and PRESTON, J.J., concur.**

**/jlr**

---

[2] We note that there was no evidence presented at the sentencing hearing that C.S. or G.R. have experienced great or unusual harm, except for the argument made by the prosecutor. Neither victim testified as to the impact Sharp's behavior has had on them, nor did the victims offer victim impact statements. Moreover, the pre-sentence investigation report is silent as to the harm to Sharp's two victims, and only states that Sharp did not use force and had consensual sex with both girls. We recognize that sex offenses against minors are heinous by their nature. However, the finding of great or unusual harm requires more than the mere fact that the offenses were, in fact, committed.