[Cite as *State v. Lewis*, 2020-Ohio-6894.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO. 15-20-04

      v.

ASHLEY L. LEWIS,                      O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-19-08-099

Judgment Affirmed

Date of Decision: December 28, 2020

APPEARANCES:

      *L. Patrick Mulligan and Laura M. Woodruff* for Appellant

      *Eva J. Yarger* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Ashley L. Lewis ("Lewis") appeals the judgment of the Van Wert County Court of Common Pleas, alleging that (1) his convictions were against the manifest weight of the evidence; (2) that his convictions were not supported by sufficient evidence; (3) that the prosecutor made unfairly prejudicial remarks; (4) that the trial court admitted an irrelevant, prejudicial exhibit; (5) that he was denied his right to the effective assistance of counsel; and (6) that he was deprived of a fair trial by these cumulative errors. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Emily Johns ("Emily") has a daughter, S.J., and a son, A.J. Tr. 48, 83. S.J. was born in 2007, and A.J. is roughly five years younger than S.J. Tr. 83. In September of 2014, Emily moved back to Ohio from Florida and began living with her father and stepmother, Alice Johns ("Alice"), in their house on Tully Street in Convoy, Ohio ("Tully Street house"). Tr. 49, 84. Emily and her children would live in this residence until the spring of 2018. Tr. 84. While Emily lived with her parents, she and her children had their own bedroom. Tr. 50, 85. A.J. slept in a crib, but Emily slept on the bottom of a bunkbed while S.J. slept on the top of this bunkbed. Tr. 85. The bedroom would also serve as a play area for the children. Tr. 158.

{¶3} In between 2014 and 2017, Emily and Lewis were in a relationship. Tr. 92, 246. At this time, Lewis lived in a residence on Mentzer Church Road in Van Wert County ("Mentzer Church Road house"). Tr. 93, 249. During the course of their relationship, Lewis and Emily would occasionally stay overnight at the other's residence. Tr. 94. Emily usually brought her children with her when she stayed the night at Lewis's house. Tr. 94. However, Lewis would generally not bring any of his three sons with him to Emily's house. Tr. 93, 94, 97.

{¶4} Lewis would also come to Emily's residence after S.J. and A.J. were home from school. Tr. 97. Oftentimes, Emily was not yet back from work. Tr. 97. During these occasions, Lewis would be by himself with the children and Alice. Tr. 97. At times, Lewis would be alone with the children in the bedroom. Tr. 67. Emily suggested that Lewis wait to come over until she was back from work, but he continued to come to her residence and spend time with her children when she was not present. Tr. 97. Emily testified that she felt that Lewis spent more time with her children than with his own and that S.J. was Lewis's favorite. Tr. 98, 99.

{¶5} Emily ended her relationship with Lewis in October of 2017. Tr. 107. Subsequently, Lewis stopped by Emily's house. Tr. 109. When S.J. saw Lewis, she ran upstairs. Tr. 109. Emily thought that S.J. "maybe * * * was in a hurry to go do something * * *." Tr. 109. However, at A.J.'s kindergarten graduation ceremony in May of 2019, S.J. saw Lewis and "flip[ped] out." Tr. 111. Emily asked

S.J. why she reacted to seeing Lewis. Tr. 112. S.J. did not immediately provide an explanation. Tr. 212. Several nights later, after Emily continued to ask S.J. questions, S.J. told her mother that Lewis had inappropriately touched her. Tr. 212. Emily then reported this to police. Tr. 114.

{¶6} On May 16, 2019, the police took an initial report of S.J.'s allegations. Tr. 232. On May 20, 2019, Detective Nathan Huebner ("Detective Huebner"), who works for the Van Wert County Sheriff's Office, sat down for an interview with Emily and S.J. at Van Wert County Children's Services. Tr. 230, 232-233. Afterwards, Detective Huebner set up an interview with Lewis that occurred on May 22, 2019. Tr. 238. This interview was recorded. Tr. 241. This recording was later played for the jury at Lewis's trial. Tr. 241.

{¶7} S.J. would allege that Lewis inappropriately touched her in three different locales. The first alleged locale was the Tully Street house. Tr. 153, 157. She testified that Lewis would come to her grandparents' house "pretty often" while her mother was still at work. Tr. 157. She stated that Lewis would come into the bedroom where she would play after school and would let her play games on his phone. Tr. 158. She stated that Lewis would have her sit on his lap while he was sitting on the bottom bunk of the bunkbed. Tr. 158-159. As she was playing games on his phone, Lewis would put one of his hands around her waist and would put his other hand down her pants. Tr. 158. S.J. testified that his hand would be inside her

underwear, touching and rubbing her vaginal area. Tr. 159-160. S.J. indicated that this happened "several times" at her grandmother's house. Tr. 163.

{¶8} The second alleged locale was at Lewis's Mentzer Church Road house. S.J. reported that she was at Lewis's house watching a movie with him on his bed at night. Tr. 164. She testified that, during the movie, he put his hands down her pants and touched her vaginal area. Tr. 164-165.

{¶9} The third alleged locale was in Emily's Ford Expedition. Tr. 167. S.J. testified that Lewis was driving her around in Emily's vehicle. Tr. 167-168. While he was driving, Lewis had Emily on his lap and would let her help steer the vehicle. Tr. 168. S.J. testified that, as she was steering, he would put his hand down her pants, beneath her underwear and would touch her vaginal area. Tr. 169.

{¶10} On August 1, 2019, Lewis was indicted on three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4). Doc. 2. The first count was for Lewis's alleged actions at Emily's then residence on Tully Street. The second count was for Lewis's alleged actions at his house on Mentzer Church Road. The third count was for Lewis's alleged actions in Emily's Ford Expedition. On January 21, 2020, S.J. was deposed by the prosecutor and Lewis's defense counsel. Tr. 145-146. This deposition was recorded. Tr. 146. This recording was later played for the jury at Lewis's trial. Tr. 146.

{¶11} A jury trial on these charges was held on February 3 and 4, 2020. Tr. 21. On February 4, 2020, the jury found Lewis guilty of the first and third counts of gross sexual imposition that had been charged against him. Doc. 40, 42. The jury found Lewis not guilty of the second count of gross sexual imposition that had been charged against him. Doc. 40, 42. On March 18, 2020, the trial court sentenced Lewis and issued a judgment entry of sentencing. Doc. 46.

{¶12} The appellant filed his notice of appeal on March 19, 2020. Doc. 60. On appeal, Lewis raises the following assignments of error:

**First Assignment of Error**

**The convictions were against the manifest weight of the evidence.**

**Second Assignment of Error**

**The convictions were not supported by sufficient evidence.**

**Third Assignment of Error**

**The prosecutor's remarks during opening statements were unfairly prejudicial.**

**Fourth Assignment of Error**

**The trial court erred in admitting an unfairly prejudicial and irrelevant exhibit.**

**Fifth Assignment of Error**

**Trial counsel was ineffective.**

**Sixth Assignment of Error**

**The cumulative errors of the trial deprived the defendant of a fair trial.**

For the sake of analytical clarity, we will consider Lewis's second assignment of error before we consider his first assignment of error.

*Second Assignment of Error*

{¶13} Lewis argues that both of his convictions for gross sexual imposition were not supported by sufficient evidence.

Legal Standard

{¶14} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40, quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12. On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that**

**the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

{¶15} In order to prove a defendant committed the offense of gross sexual imposition in violation of R.C. 2907.05(A)(4), the State must establish that the defendant (1) "ha[d] sexual contact with another, not the spouse of the offender; cause[d] another, not the spouse of the offender, to have sexual contact with the offender; or cause[d] two or more other persons to have sexual contact" and (2) "the other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).

{¶16} R.C. 2907.01 defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). Thus, "[t]hrough the definition of sexual contact in R.C. 2907.01(B), gross sexual imposition as described in R.C. 2907.05(A)(4) requires proof of touching 'for the *purpose* of sexually arousing or gratifying either person.'" (Emphasis sic.) *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, 953 N.E.2d 816, ¶ 25, quoting R.C. 2907.01(B).

Legal Analysis

{¶17} In this case, Lewis was convicted of the offenses that were alleged to have occurred in the Tully Street house and in Emily's Ford Expedition. Doc. 40, 42. First, Lewis asserts that neither of his convictions is supported by sufficient evidence because Emily and Alice did not witness him touch S.J. inappropriately. However, the State, at trial, presented S.J.'s testimony to substantiate the essential elements of the charged offenses. On January 21, 2020, S.J. was deposed by the prosecutor and the defense counsel. Tr. 145. A video recording of this deposition was played for the jury at trial. Tr. 145. We will examine her testimony regarding each of the alleged incidents for which Lewis received a conviction to determine whether they are supported by sufficient evidence.

{¶18} Regarding the incidents alleged at the Tully Street house, S.J. testified that Lewis would come over before her mother got home from work. Tr. 157-158. She stated that he would come into her bedroom where she would play after school and would let her play games on his phone. Tr. 157-158. On several of these occasions, Lewis would sit on the bottom bunk of the bunkbed while she sat on his lap. Tr. 158. S.J. testified that, as she was playing games on his phone, Lewis put one of his hands around her waist and put his other hand down her pants. Tr. 159-160. She further stated that Lewis put this hand beneath her underwear and would rub her vaginal area. Tr. 160, 162. S.J. stated that, when this happened, her

grandmother was outside of the room and that "[i]t happened when nobody was really around * * *." Tr. 162, 163. She said that she "never really reacted" and "would just keep playing [on] the phone." Tr. 163. She also testified that this "happened several times at my grandma's house." Tr. 163.

{¶19} Regarding the alleged incident in the Ford Expedition, S.J. indicated that Lewis's vehicle was not working and that he was, for this reason, driving Emily's vehicle. Tr. 167-168. S.J. testified that Lewis allowed her to sit on his lap and let her help to steer the vehicle. Tr. 169. While her hands were on the wheel, Lewis reached his hand down her pants and touched her vaginal area. Tr. 169. On this occasion, S.J. "asked him to stop and * * * pulled his hand away * * *." Tr. 169. However, she stated that "he'd stop for, like, about five minutes and then he's [sic] just keep going again." Tr. 169. She stated that this continued until they arrived at his home. Tr. 170.

{¶20} Further, S.J. testified that she was, at the time of the trial, twelve years old. Tr. 147. Thus, S.J. could not have been over the age of thirteen at the time that these incidents were alleged to have occurred. S.J. also testified that she was seven or eight around the time that her mom was dating Lewis. Tr. 155. S.J.'s testimony provided some evidence that substantiates each of the essential elements of the offenses that were alleged to have occurred at the Tully Street house and in the Ford Expedition. Thus, S.J.'s testimony, if believed, provided some evidence regarding

each of the essential elements of these charged offenses. *See State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 46.

**{¶21}** While Emily and Alice provided testimony that corroborated elements of S.J.'s description of events, we can, given the facts of this case, determine that Lewis's convictions are based on sufficient evidence without reference to Alice or Emily's testimony. *See State v. Alsip*, 8th Dist. Cuyahoga No. 93105, 2010-Ohio-1757, ¶ 14 (holding "[t]he victim's testimony alone is sufficient to withstand a Crim.R. 29 motion on the charge of gross sexual imposition."); *In re C.S.*, 10th Dist. Franklin No. 11AP-667, 2012-Ohio-2988, ¶ 29, citing *State v. West*, 10th Dist. Franklin No. 06AP-11, 2006-Ohio-6259, ¶ 16.

**{¶22}** Second, Lewis argues that State failed to establish that the alleged incident in the Ford Expedition occurred in Van Wert County and, therefore, failed to establish venue. "Although venue is not a material element of any criminal offense, it must nevertheless be proven at trial beyond a reasonable doubt, unless waived." *State v. Patterson*, 3d Dist. Hancock No. 5-11-15, 2012-Ohio-2839, ¶ 73. Ohio's venue statute is located in R.C. 2901.12, which reads, in its relevant part, as follows:

> **(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and * * * in the territory of which the offense or any element of the offense was committed.**
>
> * * *

**(G) When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those jurisdictions.**

R.C. 2907.12(A), (G).

{¶23} The following exchange took place during S.J.'s deposition regarding the charge arising from the alleged incident in the Ford Expedition:

[Prosecutor]: So where was, where were his hands?

[S.J.]: Around my waist and down my pants.

* * *

[S.J.]: Once or several times I'm pretty sure I asked him to stop and I pulled his hand away, but he wouldn't like, he'd stop for, like about five minutes and then he's [sic] just keep going again.

[Prosecutor]: Okay.

[S.J.]: And, just, I couldn't do anything.

[Prosecutor]: Okay. How did you feel when he was doing these things to you?

[S.J.]: At that moment not very good.

* * *

[Prosecutor]: Okay. So how would the truck be moving while this was going on?

[S.J.]: Yes.

> **[Prosecutor]: Okay. So how would it, how long would that go on, how far would you go, do you know?**
>
> **[S.J.]: No.**
>
> **[Prosecutor]: Okay. Why would it stop?**
>
> **[S.J.]: I think just taking us to his house, I think we were kind of just driving around.**
>
> **[Prosecutor]: Okay. Kind of just driving around till you got back to his house?**
>
> **[S.J.]: Yeah.**

Tr. 169-170. In her deposition, S.J. testified that Lewis was inappropriately touching her repeatedly as they drove towards his house in Emily's Ford Expedition. Tr. 170. Her testimony suggests that Lewis's pattern of reaching his hand in and out of her pants stopped when they reached his house. Tr. 169-170. Other evidence at trial established that Lewis's house was located on Mentzer Church Road in Van Wert County, Ohio. Tr. 84-85, 93, 234.

{¶24} Even if we concluded that S.J.'s testimony did not establish that an element of this offense was committed in Van Wert County, venue would still lie under R.C. 2901.12(G). S.J.'s testimony establishes that this offense occurred within the vicinity of Lewis's house, which is located in Van Wert County. This testimony ties this offense to a location inside Van Wert County. Thus, if we were to conclude that the precise location of the offense in relation to the relevant jurisdictional boundaries could not "reasonably be determined," S.J.'s testimony

still directly connects this offense to Van Wert County, and Lewis could be tried in Van Wert under R.C. 2901.12(G). R.C. 2901.12(G). Contrary to Lewis's assertion, the evidence presented at trial was sufficient to establish venue.

{¶25} Third, Lewis argues that the State failed to establish that his alleged contact with S.J. was for the purpose of sexual arousal or gratification. He asserts that S.J. did not testify that he "used sexual language, made noises, or engaged in other behavior * * * that [was] suggestive of sexual gratification." Appellant's Brief, 13. However, "there is no requirement that there be direct testimony regarding sexual arousal or gratification." *State v. Gerardi*, 5th Dist. Delaware No. 01CA-A-07-029, 2002 WL 228792, *2 (Feb. 4, 2002). The requisite purpose "may be discerned from the type, nature, and circumstances of the contact * * *." *State v Jones*, 3d Dist. Auglaize No. 2-98-1, 1998 WL 405906, *3 (July 22, 1998), quoting *State v. Uhler*, 80 Ohio App.3d 113, 123, 608 N.E.2d 1091 (9th Dist. 1992).

{¶26} In this case, S.J. testified that Lewis, at the Tully Street house, put his hands down her pants, beneath her underwear and rubbed her front, private area when no one else was around. Tr. 67, 75, 160-163. Similarly, S.J. testified that Lewis, while driving the Ford Expedition, put his hands down her pants, beneath her underwear and touched the outside of her vaginal area. Tr. 169. She testified that she pulled Lewis's hand away but that he put his hand down her pants again and continued to touch her vaginal area. Tr. 169.

{¶27} This Court has previously found that testimony regarding similar conduct was sufficient to establish that the defendant acted with the purpose of obtaining sexual arousal or gratification. *State v. Harrold*, 3d Dist. Seneca No. 13-2000-02, 2000 WL 1634509, *4-5 (Oct. 31, 2000); *Jones, supra*, at *3; *White, supra*, at ¶ 42. *See also State v. Adams*, 5th Dist. Licking No. 02-CA-00043, 2002-Ohio-5953, ¶ 22; *State v. Cochran*, 5th Dist. Coshocton No. 03-CA-01, 2003-Ohio-6863, ¶ 12. Thus, we conclude that S.J. provided testimony from which the jurors could find that the purpose of Lewis's contact was for sexual arousal or gratification.

{¶28} After reviewing the record in a light most favorable to the prosecution, we conclude that S.J.'s testimony provided evidence of each of the essential elements for both of Lewis's convictions for gross sexual imposition. A rational finder of fact could conclude from this evidence that the State had carried its burden of production at trial. Thus, both of these convictions are supported by sufficient evidence. Lewis's second assignment of error is, therefore, overruled.

*First Assignment of Error*

{¶29} Lewis advances a number of arguments to prove that both of his convictions are against the manifest weight of the evidence.

Legal Standard

{¶30} "When 'deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately

carried its burden of persuasion.'" *Brown*, 2018-Ohio-899, *supra*, at ¶ 8, quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "In a manifest weight analysis, 'the appellate court sits as a "thirteenth juror" * * *.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

{¶31} "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist. 1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v.*

*Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶32}** In her video deposition, S.J. testified that she lived with Emily and A.J. at her grandparents' house on Tully Street. Tr. 153. S.J. recalled that she was seven or eight when Emily was dating Lewis. Tr. 155. S.J. stated that Lewis favored her over his own children but "didn't really do anything with [her] brother." Tr. 155, 222. S.J. testified that Lewis would come over to her house "[p]retty often" while her grandmother was watching her and while Emily was still at work. Tr. 157. On these occasions, Lewis would not "socializ[e] with [her] grandmother * * *, he'd always come in to our room * * *." Tr. 158.

**{¶33}** Regarding the incidents at the Tully Street house, S.J. stated that, while her grandmother was in the other room, Lewis would sit on the bed and allow her (S.J.) to play games on his phone while she sat on his lap. Tr. 158-159, 162. S.J. testified that Lewis would put one hand around her waist and would put his other hand down her pants, beneath her underwear. Tr. 159. She further testified that he would touch and rub the outside of her vaginal area. Tr. 161-162. S.J. indicated that, in response, she "never reacted, which now seems pretty stupid * * *." Tr. 162-163.

{¶34} S.J. further testified that this happened when she was roughly seven years old and that Lewis inappropriately touched her "several times at [her] grandma's house." Tr. 163. S.J. could not remember what she was wearing specifically as Lewis was touching her but stated that she usually wore jeans. Tr. 161. She affirmed that Emily was never home when Lewis was inappropriately touching her. Tr. 167. S.J. indicated that A.J. was in the room at these times but that "he was pretty much in diapers still. He would just sit there and play with blocks." Tr. 162.

{¶35} Regarding the incident in the Ford Expedition, S.J. testified that Lewis was borrowing Emily's vehicle "because his wasn't working and my mom had just gotten a Saturn Outlook." Tr. 167. S.J. testified that, while Lewis was in the driver's seat, he had her sit on his lap and "let [her], like, kind of drive." Tr. 168. She stated that her hands were on the wheel and that she was steering the vehicle "[u]nless [she] lost a little control * * *." Tr. 169. S.J. said that Lewis put one of his hands around her waist. Tr. 169. She reported that Lewis put his other hand down her pants and touched her vaginal area. Tr. 169.

{¶36} She further testified, "[o]nce or several times I'm pretty sure I asked him to stop and I pulled his hand away, but he wouldn't, like, he'd stop for, like about five minutes and then he's [sic] just keep going again." Tr. 169. S.J. stated that, in response, she "couldn't do anything" and did not feel "very good" as this

was happening. Tr. 170. According to her testimony, Lewis did not say anything as he was touching her in the vehicle. Tr. 170. She testified that they were "kind of driving around" until they got to Lewis's house. Tr. 170.

{¶37} S.J. stated that, while Emily and Lewis were dating, she did not tell anyone that Lewis was inappropriately touching her. Tr. 171. She stated that she saw Lewis about three times after Emily and Lewis ended their relationship. Tr. 171. On the first occasion, Lewis stopped over to help Emily with her vehicle. Tr. 171. S.J. next saw Lewis at a Halloween function. Tr. 171. The third time that she saw him was at A.J.'s kindergarten program. Tr. 172. S.J. testified that, when she saw Lewis, she was "[s]cared" and "ran to [her] mom." Tr. 172. She stated that Emily was "confused" as to why she (S.J.) "was scared." Tr. 172. S.J. then said, "And [Emily] asked why and I just said—I didn't really tell her, I didn't at all. But she kept asking so for, like, the few days and I finally told her and she was not happy." Tr. 173.

{¶38} On cross-examination, S.J. admitted that, when she was first interviewed at Children's Services, she did not remember all of the incidents because she felt "under pressure." Tr. 216. She then clarified that she "was stressed * * * not really under pressure * * * because [she] was scared." Tr. 217. She further stated that she "didn't want to tell them [the social workers] anything because they're strangers to me." Tr. 217. She also affirmed that she did not tell Children's

Services everything about the incidents until her third visit with them. Tr. 217. S.J. affirmed that no one was pressuring her. Tr. 218.

{¶39} At trial, Emily testified that she was in a relationship with Lewis from 2014 to 2017. Tr. 92. She stated that Lewis would not generally bring his children over to the Tully Street house and would spend time with S.J. while she was at work. Tr. 97. Emily also testified that she felt that Lewis spent more time with her kids than with his kids and that S.J. was Lewis's favorite. She said that Alice was concerned by Lewis's presence at the house when she (Emily) was at work and that Lewis's visits caused tensions with Alice. Tr. 97, 117-118. Emily stated that, for this reason, she suggested to Lewis that he wait to come over until after she got off of work. Tr. 97.

{¶40} Emily stated that Lewis would allow S.J. to play on his phone. Tr. 98, 99, 105-106. Emily reported that she attempted to limit S.J.'s time on Lewis's phone and "actually stated to both of them one day that [S.J.] needed to stay off the phone * * *." Tr. 106. However, S.J. reported to Emily that Lewis had "told [her (S.J.)] it was OK to be on the phone * * *" and "told [her (S.J.)] not to tell [Emily]." Tr. 106. Emily confronted Lewis about this several times, but he continued to allow S.J. to play on his phone. Tr. 106-107.

{¶41} In her testimony, Emily confirmed that she had a Ford Expedition and that Lewis was allowed to drive this vehicle. Tr. 102. She testified that, for a time,

Lewis borrowed her Ford Expedition because his vehicle was in the repair shop for a couple of weeks or months. Tr. 102. Emily also confirmed that, after she and Lewis had ended their relationship, Lewis came to her house to bring her a back brace and that S.J. ran upstairs when she saw Lewis come in the front door. Tr. 109. She also stated that S.J. saw Lewis again at a Halloween activity and then at A.J.'s kindergarten program. Tr. 110.

{¶42} On cross-examination, Emily admitted that she did not have personal knowledge regarding the allegations against Lewis and that she did not see Lewis engage in any inappropriate behavior towards S.J. Tr. 119. She testified that she was shocked when she heard S.J.'s allegations and that she did not, before May of 2019, have any reason to be concerned about Lewis's prior interactions with her children. Tr. 121. Emily also stated that S.J. did not state the full extent of the allegations on the night that she finally explained why she was fearful of seeing Lewis at the kindergarten program. Tr. 122.

{¶43} Alice also testified at trial. Tr. 47. She testified that S.J. and Emily began living in her house in September of 2014 and that S.J. turned twelve in December of 2019. Tr. 49, 50. Alice stated that Lewis would come to the house while Emily was still at work. Tr. 59. She noted that Lewis would pay attention to S.J. but would not pay much attention to S.J.'s younger brother. Tr. 66. Alice testified that Lewis would go into S.J.'s room and play with her. Tr. 60. She

remembers Lewis "sitting there, sitting there on the bed and her [S.J.] too, either on his lap or sitting beside him and it just, then it went from sitting to laying down on the bed together." Tr. 61. Alice stated that Lewis and S.J. would sometimes have a blanket "on their lap." Tr. 67. She also saw S.J. playing on Lewis's phone even after Emily told Lewis not to allow S.J. to play as much on his phone. Tr. 62.

{¶44} Alice stated that she was not always in the same room as Lewis and S.J. Tr. 63. She testified that she was sometimes watching television or caring for A.J. in another room while Lewis and S.J. were in the bedroom. Tr. 63-64. She affirmed that she did not have "eyes on them 100% of the time." Tr. 67. Alice also stated that she has issues with mobility and had to use a cane to get around her house during the time in which S.J. was living with her. Tr. 66. She further testified that she could not see into the bedroom where S.J. and Lewis were sitting from the place she often was in the kitchen. Tr. 68.

{¶45} On cross-examination, Alice stated that she did not want Lewis coming over before Emily returned from work. Tr. 71. However, she also stated that she did not tell Lewis to stop coming to the house when Emily was not present. Tr. 70. Alice testified that, besides sitting or lying down on the bed with S.J., she did not see Lewis engage in any other inappropriate behavior. Tr. 74. She also admitted that she did not have any personal observations regarding the allegations

-22-

that S.J. had raised because she (Alice) was in the other room at the times of the alleged incidents. Tr. 75.

{¶46} At trial, Detective Huebner testified that he sat down for an interview with S.J. and Emily on May 20, 2019. Tr. 232. He stated that he then scheduled an interview with Lewis for May 22, 2019. Tr. 233. A recording of the interview between Detective Huebner and Lewis was played for the jury. Tr. 241. In this interview, Lewis stated that he did not sexually abuse S.J. and that he did not touch her vaginal area. Tr. 253, 261. He further stated that S.J. was lying about him inappropriately touching her and that S.J. had previously gotten in trouble with Emily for lying. Tr. 262. Lewis did admit that he let S.J. play games on his phone and that S.J. had sat on his lap while they were watching television. Tr. 255, 256. He also stated that he saw S.J. on Halloween and at a kindergarten program he attended with a friend. Tr. 252, 254. He said that he would watch Emily's kids at her house but that other people were around when he was with S.J. Tr. 260, 265.

{¶47} After the interview was played, Detective Huebner testified that he had another interview with S.J. because she had remembered another incident. Tr. 273-274. He then explained that they did not use a SANE kit to collect physical evidence because of the length of time that had passed since the alleged incidents. Tr. 274. He also stated that, given S.J.'s description of the inappropriate touching, he would not expect any identifiable injuries on S.J.'s body. Tr. 275. He also

testified that, in his experience, it was common for a child not to report abuse of this nature immediately after the incident. Tr. 276. Detective Huebner further testified that, if a person was grooming a child for sexual abuse, that person would not generally behave negatively towards that child. Tr. 277.

{¶48} Based on the testimony presented at trial, Lewis raises several arguments to establish that his convictions are against the manifest weight of the evidence. First, he argues that Emily and Alice's testimony was not based on firsthand knowledge of the allegations. *See* Tr. 75. However, they did not need to witness the alleged incidents and provide direct corroboration for S.J.'s allegations for the jury to find Lewis guilty. *See State v. Shifflet,* 2015-Ohio-4250, 44 N.E.3d 966, ¶ 98 (4th Dist.); *State v. Patterson*, 2017-Ohio-8318, 99 N.E.3d 970, ¶ 23 (8th Dist.); *In re C.S.*, *supra*, at ¶ 29-30; *State v. Tiggett*, 11th Dist. Trumbull No. 2018-T-0036, 2019-Ohio-1715, ¶ 33.

{¶49} Further, Emily and Alice's testimony did corroborate a number of contextual details surrounding S.J.'s essential allegations. Alice testified that Lewis would come to spend time alone with the children at her house when Emily was at work; that S.J. would sit on Lewis's lap on the bed; that S.J. would play on Lewis's phone; and that she (Alice) was not always in the same room as S.J. during Lewis's visits. Tr. 58, 59, 62, 67, 68, 73. Emily's testimony established that Lewis spent time with the children while she was at work; that Lewis let S.J. play on his phone;

that Lewis favored S.J.; and that Lewis had driven her Ford Expedition. Tr. 98, 100, 106. This testimony tends to support the credibility of S.J.'s allegations. For these reasons, we find this argument to be without merit.

{¶50} Second, Lewis argues that the lack of physical evidence renders his convictions against the manifest weight of the evidence. However, physical evidence is "not required to sustain a sex offense conviction." *State v. Branch*, 3d Dist. Allen No. 1-12-44, 2013-Ohio-3192, ¶ 110, citing *State v. Sauto*, 9th Dist. No. 26404, 2013-Ohio-1320, ¶ 45-47. *See State v. Thomas*, 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, ¶ 25; *West, supra*, at ¶ 18. Further, in this case, Detective Huebner provided testimony as to why the State was unable to produce any physical evidence. He explained that physical evidence would not have been available given the delay in between the alleged incidents and the investigation. Tr. 274. He also stated that he would not expect S.J. to have any identifiable, physical injury based on her description of the inappropriate touching. Tr. 275. After considering the record, we find Lewis's argument to be without merit.

{¶51} Third, Lewis argues that S.J. failed to identify a specific date for the allegations. We note that, in this case, more precise dates for the alleged incidents were not necessary to prove an essential element of these offenses. The testimony at trial indicates that Emily and Lewis dated in between 2014 and 2017, placing the alleged incidents during that period of time. Tr. 92. In this timeframe, S.J. was

roughly between the ages of seven and ten. Tr. 83. Thus, the State established that S.J. was under the age of thirteen at all relevant times as is required to prove the offense of gross sexual imposition under R.C. 2907.05(A)(4).

{¶52} Further, this Court has previously held that, in cases when young children are the victims of a crime,

> **'it is reasonable that they [are] not able to remember exact times and dates of the rapes. This is especially true where the crimes involve several instances of conduct spread out over an extended period.' *State v. Humfleet*, 12th Dist. Clermont No. CA84-04-031, CA84-05-036, 1985 WL 7728, \*7 (Sept. 9, 1985), citing *State v. Madden*, 15 Ohio App.3d 130, 132, 472 N.E.2d 1126, 1129 (12th Dist. 1984). *See State v. Geboy*, 145 Ohio App.3d 706, 724-725, 764 N.E.2d 451, 465 (3d Dist. 2001). 'It is well settled that, particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity.' [*State v.*] *Henderson*, [8th Dist. Cuyahoga No. 87236, 2006-Ohio-5567,] ¶ 14, quoting *State v. Koelling*, 10th Dist. Franklin Nos. 94APA06-866 and 94APA06-868, 1995 WL 125933 (March 21, 1995).**

*State v. Cook*, 3d Dist. Auglaize No. 2-18-21, 2019-Ohio-3610, ¶ 10.

{¶53} While the case before this Court involves the crime of gross sexual imposition, the logic of *Cook* is still herein applicable. *Cook* at ¶ 10. *See also State v. Triplett*, 11th Dist. Ashtabula No. 2013-A-0018, 2013-Ohio-5190, ¶ 44. S.J. was a young child at the times of the incidents. Tr. 83. Further, the alleged incidents occurred on multiple occasions in different locations over a period of time. Tr. 160, 163, 167. In the end, Lewis has not, given the facts of this case, demonstrated how

the lack of more specific dates for the alleged offenses tends to establish that his convictions are against the manifest weight of the evidence.

{¶54} Fourth, Lewis also points to the facts that S.J. did not immediately report the alleged offenses as evidence that this convictions are against the manifest weight of the evidence. Lewis also questions S.J.'s silence on the grounds that she never indicated that she had been threatened if she came forward with the allegations. Detective Huebner addressed both of these issues in his trial testimony. He stated that, in his experience, it was common for abuse of this nature not to be reported immediately. Tr. 276. He also stated that, if a child is being groomed, the abuser would ordinarily not behave negatively towards that child, indicating that threats may not accompany all abuse of this nature. Tr. 277.

{¶55} Further, courts across this state have concluded that a delay in reporting allegations of sexual abuse does not necessarily indicate that a conviction for the related offenses is against the manifest weight of the evidence. *State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 33-34; *State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 50; *State v. Weaver*, 7th Dist. Columbiana No. 18 CO 0015, 2019-Ohio-2715, ¶ 8, 17; *State v. Mathis*, 8th Dist. Cuyahoga No. 83311, 2004-Ohio-2982, ¶ 25, 27. Thus, we conclude that this argument is without merit.

{¶56} Fifth, Lewis argues that S.J.'s testimony regarding the alleged incidents was not sufficiently specific. While we have already concluded that S.J.'s testimony contained enough specificity to provide sufficient evidence to support Lewis's convictions, this argument addresses the credibility of S.J.'s testimony. "[T]he credibility of witnesses is primarily an issue for the trier of fact." *State v. Sharp*, 3d Dist. Putnam No. 12-13-01, 2014-Ohio-4140, ¶ 43. For this reason, "[w]e will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently clear that the fact finder lost its way." *Id.*

{¶57} In this case, the jurors apparently determined that S.J.'s testimony was credible. For each of these two incidents, S.J. described where she was located; what she was doing; what Lewis was doing; the area of her body that Lewis touched; and how Lewis touched her. After reviewing the record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in determining that S.J.'s testimony was credible. Thus, we find this argument to be without merit.

{¶58} Sixth, Lewis argues that the S.J. did not present any testimony regarding sexual motivation. While we have already determined that S.J.'s testimony provided some evidence from which a trier of fact could infer that the purpose of Lewis's alleged contact was sexual arousal or gratification, this argument is about whether such an inference is against the manifest weight of the evidence.

Further, we also have already found that the jury did not lose its way in relying on the credibility of S.J.'s testimony in reaching a verdict.

{¶59} In her deposition, S.J. stated that Lewis put his hand down her pants, beneath her underwear and rubbed her vaginal area on more than one occasion while she was at the Tully Street house. Tr. 160-162. She also testified that Lewis put his hand down her pants, beneath her underwear and touched her vaginal area while they were in Emily's Ford Expedition. Tr. 167. There is no indication from S.J.'s testimony that Lewis's alleged contact with her vaginal area was accidental or was undertaken for a non-sexual purpose.

{¶60} Given the circumstances surrounding these incidents and the nature of this contact, a jury could reasonably infer from S.J.'s testimony that Lewis was motivated by the purpose of sexual arousal or gratification. *Matter of R.C.*, 2020-Ohio-1486, --- N.E.3d ---, ¶ 60 (4th Dist.). Further, while Lewis's statements to Detective Huebner conflict with S.J.'s testimony as he denied acting in this manner, the jurors, as finders of fact, were permitted to resolve the conflicts between S.J.'s testimony and Lewis's statements in favor of the State. Tr. 253, 261-262. *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 47.

{¶61} Seventh, Lewis also asserts that S.J.'s testimony about the alleged incident at his house on Mentzer Church Road was not credible. However, the jury acquitted Lewis of the charge that arose from this alleged incident. Doc. 40, 42.

We assume that Lewis points to S.J.'s testimony underlying this charge to argue that S.J. was not a credible witness. But in evaluating the charges against Lewis, the jury, as finder of fact, "was free to believe [or disbelieve] all, part, or none of [the] * * * testimony" offered by S.J. *State v. Dixon*, 3d Dist. Crawford No. 3-06-17, 2007-Ohio-2989, ¶ 26.

{¶62} As is often the case, it is not clear why the jurors chose to acquit Lewis of one of the three charges against him. However, even if the jurors acquitted Lewis of this charge because they found S.J.'s testimony not to be credible on this matter, this would not mean that every word of S.J.'s testimony was entirely lacking in credibility and that Lewis should have, therefore, been acquitted of all of the charges against him. A jury does not have to choose between believing all or none of a witness's testimony. *Dixon* at ¶ 26. Thus, the arguments against the charge for which Lewis was acquitted do not establish that the charges for which he received convictions are against the manifest weight of the evidence.

{¶63} After considering the evidence presented at trial, we find that this case does not present the exceptional circumstance in which the evidence presented at trial weighs heavily against the conviction. Further, we do not find any indication that the jury lost its way and created a manifest miscarriage of justice. Thus, neither of Lewis's convictions are against the manifest weight of the evidence. Accordingly, Lewis's first assignment of error is overruled.

*Third Assignment of Error*

**{¶64}** To argue that the State engaged in prosecutorial misconduct, Lewis alleges that the prosecutor made improper comments during opening and closing arguments that were not based on evidence presented at trial.

Legal Standard

**{¶65}** "The test for prosecutorial misconduct is [1] whether remarks are improper and, if so, [2] whether they prejudicially affected substantial rights of the accused." *Lott* at 165, citing *State v. Smith*, 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984). In determining whether the prosecutor's remarks were improper and prejudicial, appellate courts generally consider four factors:

> **(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant. [*State v.*] *Johnson*[, 2014-Ohio-4750, 22 N.E.3d 249,] ¶ 87 [(3d Dist.)], quoting *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist. 1995).**

*State v. Potts*, 2016-Ohio-5555, 69 N.E.3d 1227, ¶ 84 (3d Dist.).

**{¶66}** In determining whether a prosecutor made improper comments, appellate courts are to remain mindful of the fact that "the State has 'wide latitude' in its closing argument." *State v. Call*, 3d Dist. Marion No. 9-03-21, 2004-Ohio-288, ¶ 15, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). "The State is largely free to comment on 'what the evidence has shown and what

reasonable inferences may be drawn therefrom.'" *Call* at ¶ 15, quoting *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300 (1990).

**{¶67}** In determining whether the remarks were prejudicial, appellate courts must "evaluate the allegedly improper statements in the context of the entire trial." *Klein* at ¶ 60, citing *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). "To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different." *State v. Thompson*, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 23 (3d Dist.). "An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *Treesh* at 464.

Legal Analysis

**{¶68}** On appeal, Lewis identifies the following portion of the prosecutor's opening statement as the basis for this assignment of error:

> **The evidence is going to show that the Defendant is guilty of at least three counts of Gross Sexual Imposition of a child less than thirteen years of age.**
>
> **This, ladies and gentlemen of the jury, is what we expect the evidence to show. It will prove that between September of 2014 and October of 2017, the defendant committed, at least, three counts of Gross Sexual Imposition. We think that there were more at the grandmother's house, but we have at least three counts.**

Tr. 40-41. Lewis also identifies a portion of the prosecutor's closing arguments in this assignment of error:

> **In the indictment, there are three counts. We believe, and the evidence showed, this happened at the grandparents' house on Tully Street in Convoy, the Defendant's house on Mentzer Church Road, and in the Ford truck probably somewhere between the two.**
>
> **And it probably happened more than once at the grandparents' house in Convoy.**

Tr. 297. Lewis asserts that a prosecutor was not permitted to make statements that were not based on the evidence at trial on matters that were foreign to the case.

{¶69} We will begin our analysis by considering the nature of these remarks. In this case, S.J. testified that Lewis touched her under her clothing "several times at my grandma's house" and that "[i]t happened when nobody was really around, which was often." Tr. 163. Thus, there was testimony at trial that indicated S.J. was inappropriately touched by Lewis on multiple occasions at the Tully Street house. Tr. 163. Contrary to Lewis's assertions, the prosecutor's remarks were based on evidence presented to the jury at trial.

{¶70} Given the context of this trial, it is clear that the prosecutor was explaining that Lewis had only one charge for his actions at the Tully Street house even though the evidence indicated that he may have committed multiple offenses there. These statements were not purely conjectural or based on matters that had not been presented as evidence to the jury. This was an appropriate explanation of

the evidence that had been presented at trial to the jury. Since Lewis has not established that the prosecutor's comments were improper, he cannot, under the facts of this case, establish that he was unfairly prejudiced by these remarks.

**{¶71}** In the end, Lewis has not carried the burden of demonstrating that the prosecutor made comments that were improper and unfairly prejudicial. For this reason, he is unable to establish that the State engaged in prosecutorial misconduct. Accordingly, Lewis's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶72}** Lewis argues that the trial court erred by admitting an unfairly prejudicial photograph at trial.

Legal Standard

**{¶73}** Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is generally admissible. Evid. 402. However, relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

**{¶74}** Under the Ohio Rules of Evidence, "the admission of photographs is left to the sound discretion of the trial court." *Maurer*, *supra*, at 264, citing Evid.R. 403, 611(A). Thus, "[a]n appellate court reviews a trial court's determination on

the admission of evidence under an abuse of discretion standard." *State v. Duncan*, 3d Dist. Allen No. 1-19-75, 2020-Ohio-3916, ¶ 11. An appellate court is not to substitute its judgment for that of the trial court but will reverse the trial court's decision if it is unreasonable, arbitrary, or capricious. *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23.

{¶75} However, "if the party wishing to exclude evidence fails to contemporaneously object at trial when the evidence is presented, that party waives for appeal all but plain error." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 53-54. Under Crim.R. 52(A), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> **"In order to find plain error under Crim.R. 52(B), there must be an error, the error must be an 'obvious' defect in the trial proceedings, and the error must have affected 'substantial rights.'"** *State v. Bowsher*, **3d Dist. Union No. 14-07-32, 2009-Ohio-6524, ¶ 12, quoting** *State v. Barnes*, **94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). 'The standard for plain error is whether, but for the error, the outcome of the proceeding clearly would have been otherwise.'** *State v. Hornbeck*, **155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing** *State v. Long*, **53 Ohio St.2d 91, 372 N.E.2d 804 (1978).**

*State v. Taflinger*, 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 17. "The defendant bears the burden of establishing an obvious defect in the proceedings." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 7. Further, "[w]e recognize plain error 'with the utmost caution, under exceptional circumstances and

only to prevent a manifest miscarriage of justice.'" *State v. Cartlidge*, 3d Dist. Seneca No. 13-18-33, 2019-Ohio-1283, ¶ 11, quoting *State v. Frye*, 3d Dist. Allen No. 1-17-30, 2018-Ohio-894, ¶ 94.

Legal Analysis

**{¶76}** Lewis argues that the trial court erred by admitting a picture of S.J. into evidence as an exhibit. Ex. 7. He asserts that the admission of this exhibit was unfairly prejudicial because the picture depicted S.J. in an emotional state. We note, however, that the Defense did not raise an objection to the admission of this evidence at trial. Tr. 235, 277-278, 280. For this reason, we will only review the admission of this picture for plain error. *State v. Wendel*, 2016-Ohio-7915, 74 N.E.3d 806, ¶ 23 (3d Dist.).

**{¶77}** At trial, Detective Huebner identified the challenged picture as a screenshot from a video recording of the interview that he had with S.J. Tr. 236. Detective Huebner brought a copy of this screenshot to an interview he subsequently had with Lewis. Tr. 267. At this interview, Detective Huebner presented Lewis with this picture to convey S.J.'s emotional state at the time she was reporting her allegations about Lewis's conduct. Tr. 267. In this interview, Detective Huebner and Lewis engaged in the following exchange over this picture:

> **[Detective Huebner]: Well, I mean to be honest with you, um, like I said I sat through and was a huge part of the interview with [S.J.] and a lot of the details and information she shared, she did not**

**come across to me as making up this story and making up all of this information.**

**\* \* \***

**[Detective Huebner]: This is what, this is during the interview, it's a picture of how that girl was crying and acting when trying to share the details that she said happened to her. And I find it, I don't find an 11-year-old kid to be making up that type of emotions if it didn't happen to them.**

**[Lewis]: No. Like I said, you can confer Emily too [sic] back it [sic] when her and I were still together and Emily was having a problem with her lying, [S.J.] would act the exact same way and it'd be a screaming match between her and Emily.**

**[Detective Huebner]: This wasn't screaming.**

**[Lewis]: Oh I understand that.**

**[Detective Huebner]: This was a girl that was very, very upset and had a very, very hard time sharing the details of what she's reporting took place with her. This is how her mom and her broke down at the end of the interview.**

Tr. 266-267. Ex. 7. A recording of this interview was played at trial. Tr. 241.

{¶78} We note that Detective Huebner described this picture in the interview and that the jury would have heard this description in the recording regardless of whether the photograph had been admitted as an exhibit. Tr. 266-267. The State argues persuasively that, under the circumstances in this case, "[i]t would have been more prejudicial to permit the jury to speculate about the content of the photograph referenced as opposed to simply showing it to them." Appellee's Brief, 19. This

picture enabled the jurors to understand this portion of the recorded interview and was, therefore, relevant evidence.

{¶79} On appeal, Lewis has not demonstrated how this picture was unfairly prejudicial. He also has not explained, pursuant to the plain error standard, how the outcome of his trial would have been different in the absence of this one picture. After reviewing the evidence in the record, we conclude that Lewis would have been convicted even if this one picture had been excluded. Since Lewis has not carried the burden of establishing plain error, his fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶80} Lewis points to three instances in which his trial counsel made decisions that allegedly deprived him of his right to the effective assistance of counsel.

Legal Standard

{¶81} "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *Harvey*, *supra*, at ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her

counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶82}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Howton*, *supra*, at ¶ 35, quoting *Strickland* at 687. In order to establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Davis*, *supra*, at ¶ 36, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

Legal Analysis

**{¶83}** *Failure to object during opening and closing statements*: Lewis argues that his defense counsel should have objected to several allegedly improper remarks that the prosecutor made during opening and closing arguments. Lewis identified these allegedly improper comments in his third assignment of error. We begin our

analysis by noting that "[t]he failure to object is not a per se indicator of ineffective assistance of counsel because counsel may refuse to object for tactical reasons." *State v. Wuensch*, 2017-Ohio-9272, 102 N.E.3d 1089, ¶ 50 (8th Dist.).

**{¶84}** Further, in disposing of the third assignment of error, we determined that the comments that Lewis identified were not improper. We cannot find that defense counsel's performance was deficient because he failed to object to permissible comments. *State v. Jackson*, 4th Dist. Pickaway No. 11CA20, 2012-Ohio-6276, ¶ 34 (holding that, "[i]f prosecutorial misconduct did not occur, the failure to object cannot constitute ineffective assistance of counsel."). We also cannot find that the result of this trial would have been different had Lewis's defense counsel objected to these permissible comments. Thus, this argument is without merit.

**{¶85}** *Failure to challenge jurisdiction*: Lewis argues that his defense counsel should have challenged his conviction for the incident in the Ford Expedition on the grounds that the State failed to establish venue. Lewis alleged that the State failed to establish venue for this charge in his second assignment of error. In our analysis of those arguments, we determined that the State did properly establish venue for this particular charge.

**{¶86}** Since the State proved venue, the defense counsel's decision not to challenge venue does not constitute deficient performance. *State v. Walker*, 5th

Dist. Licking No. 01-CA-00091, 2002-Ohio-5101, ¶ 15; *State v. Cornwell*, 4th Dist. Pickaway No. 10CA7, 2011-Ohio-1220, ¶ 11. Further, we also cannot find that the outcome of Lewis's trial would have been different if his defense counsel had raised a challenge before the trial court that has since failed on appeal. *State v. Witherspoon*, 8th Dist. No. 94475, 2011-Ohio-704, ¶ 33 (holding that "the failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel and is not prejudicial."). For these reasons, this argument is without merit.

{¶87} *Failure to object to State's Exhibit*: Lewis argues that his defense counsel should have objected to the admission of State's Exhibit 7. This exhibit was the subject of Lewis's fourth assignment of error. In that analysis, we concluded, pursuant to the plain error standard, that the outcome of his trial would not have been different in the absence of this one exhibit. Thus, we cannot find that the outcome of this trial would have been different if his defense counsel had objected to this same picture at trial. *State v. Drippon*, 9th Dist. Medina No. 2417-M, 1995 WL 592246, *3 (Oct. 4, 1995); *State v. Daniels*, 9th Summit No. 26406, 2013-Ohio-358, ¶ 15. Thus, this argument is without merit.

{¶88} After examining each of these arguments, we conclude that Lewis has not carried the burden of establishing that his defense counsel's performance was deficient and prejudiced his substantial rights. He has not, therefore, demonstrated

that he was denied his right to the effective assistance of counsel. Accordingly, Lewis's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶89} Lewis argues that he was deprived of a fair trial because of the cumulative effect of the errors that he has identified his first five assignments of error.

Legal Standard

{¶90} "The constitutional 'guarantee of a fair trial does not mean an error-free or perfect trial * * *.'" *Davis, supra*, at ¶ 44, quoting *City of Columbus v. Forest*, 36 Ohio App.3d 169, 171, 522 N.E.2d 52, (10th Dist. 1987). However, "[u]nder the doctrine of cumulative error, 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal.'" *Beaver, supra*, at ¶ 20, quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Legal Analysis

**{¶91}** Lewis asserts that the alleged errors that he identified in his prior five assignments of error provide a basis for his convictions to be reversed pursuant to the doctrine of cumulative error. However, we have already determined the arguments in these five prior assignments of error are without merit. Since Lewis has not identified any actual errors that were committed during his trial, the doctrine of cumulative error is herein inapplicable. *State v. Mitchell*, 3d Dist. Union No. 14-19-14, 2019-Ohio-5168, ¶ 55. Thus, Lewis's sixth assignment of error is overruled.

*Conclusion*

**{¶92}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Van Wert County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**PRESTON and ZIMMERMAN, J.J., concur.**

**/jlr**